## ALICE DAVIS v. R. D. FRY.

(Filed September 2, 1904.)

**DRAINAGE—Surface Waters.** When surface waters by natural drainage collect in a natural basin or depression upon the premises of a dominant tenement, and escape therefrom only by percolation or evaporation, forming thereby a lake or pond, permanent in its character, the waters so collected and coming to rest lose the character of surface water, and may not by artificial means, other than that incident to the cultivation of the soil, be drained to the damage of a servient tenement, without liability in damages for such act.

(Syllabus by the Court.)

*Error from the District Court of Blaine County; before James K. Beauchamp, Trial Judge.*

*Payne & Bennett,* for plaintiff in error.

*Hotchkiss & Emery,* for defendant in error.

### STATEMENT OF FACTS.

This action was originally commenced in the probate court of Blaine county and after trial and judgment therein appealed to the district court.

It appears from the pleadings in the case that at the time of commencing the action the plaintiff was the lessee of the northwest quarter of the northwest quarter of section seventeen, township sixteen, range eleven, Blaine county, Oklahoma Territory, and at the time of the injury complained of had growing thereon a crop of corn. The defendant, Alice Davis, was the owner of the southwest quarter of section eight, township sixteen, range eleven, upon which there was a depression which at various times in the year contained more or less water as the result of drainage of surrounding lands, making a lake or pond of some ten or fifteen acres which was retained there by the natural conformation of the land until absorbed or evaporated; that the defendant caused a ditch to be excavated of such depth and extent as to drain said depression and cause the water accumulating there to immediately flow off through such drain, which it did at the time complained of, and over and onto the premises of plaintiff, destroying his crop there growing, and for which he asked judgment in damages.

The case was tried to the court without a jury, at the conclusion of which trial the defendant requested special

findings of fact by the court, which were accordingly made as follows:

"In the district court of Blaine county, Oklahoma Territory, November term, 1902. R. D. Fry, plaintiff, v. Alice Davis, defendant. Findings of the court.

"Now on this 4th day of December, 1902, the court after hearing the evidence, argument of counsel and being fully advised in the premises, and after a personal inspection of the premises by the judge, as per request of parties, finds the following facts:

"1st. That the plaintiff, R. D. Fry, as the renter, was in possession of the northwest quarter of the northwest quarter of section 17, township 16, range 11, Blaine county, Oklahoma Territory, and in the lawful and peaceable possession thereof.

"2nd. That in the spring of 1901, plaintiff plowed, prepared and planted said land to corn.

"3rd. That until and on the 12th day of May, 1901, said crop was in a good and prosperous condition.

"4th. That plaintiff, under his lease, was to pay as rent for said land one-third of said crop, and that plaintiff had a two-thirds interest in said crop.

"5th. That on the 12th day of May, 1901, prior thereto, and ever since, the defendant, Alice Davis, was and is the owner of the southwest quarter of section 8, township 16, range 11 in said county.

"6th. That in the spring of 1901, and while the defendant was the owner and in possession of said southwest quarter of section 8, township 16, range 11, the defendant caused to be dug a ditch from a large pond located on her land, across and over her said lands and into the public highway between the land of defendant and the land of plaintiff, upon which plaintiff's crop was growing.

"7th. That said pond on defendant's land had and has no natural outlet, and at various times of the year is filled

with water from a large area of surrounding country, leaving a large body of water in said lake, from one to two and a half feet deep and covering about fifteen acres.

"8th.  The said ditch was cut by the defendant for the purpose of draining the water from said pond.

"9th.  That the defendant, by the cutting of said ditch, turned all the water in said pond into and through said ditch, over and across the highway, and upon the land leased by plaintiff, and upon which his crop of corn was cultivated and growing, caused the same to be inundated and covered with water to the depth of several inches, and thereby destroyed a portion of plaintiff's crop of corn, to the amount of about fifteen acres.

"10th.  That the water remained on said land, and continued to run through said ditch from said pond, until stopped by the order of injunction of this court.

"11th.  That said ditch is about fifty rods long, commencing upon defendant's land, from said pond over and across defendant's line, and across the south line thereof, and to within forty-eight feet of plaintiff's corn ground.

"12th.  That said ditch was cut through a hill from two and a half to three feet higher than the bottom of said pond.

"13th.  That said ditch was not cut over a natural outlet from said pond.

"14th.  That said pond is filled from the drainage of the surface waters from the surrounding lands, and the water stands and remains until the same evaporates and sinks away in the ground.

"15th.  That there was no considerable body of water in said pond when said defendant caused the ditch to be dug.

"16th.  That said ditch did not fill with water until May 12th, 1901, and that the same filled at that time as the result of a heavy rain and hail storm.

"17th.  There were no ditches or other artificial means

used to control or collect the water that was gathered in the pond thereon by defendant.

"18th. That said pond was not fed or supplied by any spring, streams, swamp or lakes, but only by rain, hail and snow falling on the surrounding lands, which was conducted into the said pond by the natural surface of the country surrounding it.

"19th. The grass growing in said pond is what is commonly known as pond grass, and of no value for pasturage, and the land covered thereby is what is commonly known as 'gumbo' or 'hard-pan,' and of no value for cultivation of crops or tillage.

"20th. The said ditch was from two and a half to three feet wide at the top, and from eighteen inches to two feet at the bottom, and was filled with water flowing from said pond from the evening of May 12th until stopped by the order of injunction of this court.

"21st. That plaintiff while said ditch was being constructed warned the defendant of the danger of damage to him, and on the 17th day of May, 1901, secured an order of injunction from this court, preventing defendant from maintaining said ditch, causing the same to be closed.

"22nd. That said ditch has not been open since.

"23rd. That the hail and rains of May 17th, 1901, and subsequent thereto, fell upon plaintiff's corn crop to about the same degree as that which fell upon defendant's land, and that said rain and hail was damaging to vegetation, and that at said time plaintiff's corn being very young, and where not drowned by the water flowing from said ditch, soon recovered and yielded about 26 bushels of corn per acre.

"24th. That the tract of land upon which plaintiff's corn was growing is smooth, slightly sloping to the east, and not subject to overflow from natural causes, and the crops thereon had not been damaged in years previous and subsequent to that of 1901, except possibly in a small buffalo wallow thereon.

"25th. That water that collected on plaintiff's corn had only partially run off and sunk down by Sunday, May 19th, 1901, and after the ditch was dammed on May 17th, 1901.

"26th. The rains of Sunday evening and Monday, May 19 and 20, 1901, by reason of the water then standing in plaintiff's corn land, again caused plaintiff's corn to be covered and flooded with water.

"27th. The damage to plaintiff's corn was caused by the flow of water from said ditch and as a result thereof, and not from any other water thereon from other directions, as a natural result of downfall of rain and hail, had not said ditch been constructed.

"28th. Plaintiff had a two-thirds interest in said corn crop as tenant.

"29th. That the land upon which plaintiff's crop was growing is now occupied by Sisto Seschetti, who now has a crop of wheat growing thereon.

"30th. There was evidence of the value of plaintiff's corn crop during the month of May, 1901, adduced to show the value at that time by comparison with the remainder of the crop produced.

"31st. This action was originally brought against Frank Krahn, Will Davis and Alice Davis as defendants; Frank Krahn and Will Davis were wholly discharged by this court at the April term, 1902.

"32nd. The plaintiff could have re-planted his corn after May 25th, 1901, but it would not have been ordinarily prudent or with the expectation of realizing for his efforts.

"33rd. The court finds that the plaintiff, by reason of the construction of said ditch by defendant, and the drainage of water from said pond, has sustained damage in the sum of $100.00.

"Conclusion. The court therefore concludes that the issues are with the plaintiff herein against the defendant herein, Alice Davis, and that plaintiff is entitled to judgment

against the defendant Alice Davis for the sum of $100.00 as damages sustained, and costs of suit."

Upon the facts so found the court rendered judgment in favor of plaintiff in the sum of $100.00 for damages sustained and costs. Defendants bring the cause to this court alleging error of law.

Opinion of the court by

GILLETTE, J.: This case comes to this court upon a question of law applicable to the facts found and determined by the court below.

It is contended by the plaintiff in error that the injury complained of does not constitute a legal injury under the law. The Statutes of this Territory contain no provision which assists in the analysis of the proposition here submitted. Sections 4052 to 4062, general Statutes of 1893, defining easments and servitudes, their creation and abolishment, contain no provsions which throw any light upon the subject here under investigation; the whole subject-matter is therefore left to be determined by the rules of the common law.

While the defendant in error is shown to have no estate in the land upon which his crop was growing, other than that of a lessee, he, nevertheless, to the extent of his lease, had the right to the use and occupation thereof with no greater servitude from the dominant or upper land owner than the owner of the fee would be compelled to recognize; and we think it will be conceded that if the lessee should suffer damage by the act of the lessor in granting to the dominant tenement a right of servitude with reference to surface water which did not exist at the time of the creation of the lease, the lessor would be liable to the lessee for the

damages sustained by reason of the creation of such servitude, and we think therefore thát he may have such right of action against one who creates such servitude wrongfully, for any damages he has sustained in the enjoyment of his leasehold estate.

Counsel for both plaintiff and defendant in error, have been commendably diligent in briefing the authorities governing injuries by flowing water. Many cases have been cited, however, which have little if any application to the issues framed in this case.

The plaintiff in error is the owner of the dominant tenement, upon which is a natural depression which receives and holds during a rainy season, surface water which collects there from the natural drainage of quite a large scope of adjacent territory, and from which there is no natural outlet, and beyond which there is no ravine or surface indication of a natural water course, when such depression is full to overflowing.

The depression contains 15 to 20 acres of ground flooded in times of heavy rainfall. The plaintiff in error caused a ditch to be dug so as to drain this depression, and discharge the water therefrom over and onto defendant's crop, on the adjoining premises, destroying the same.

The right of such drainage by the plaintiff in error is the point in issue. The cases are numerous which hold that the dominant or upper owner of land, has a natural easment or servitude upon the lower or servient one, to discharge all waters flowing or accumulating on his land which is higher, upon or over the land of the servient owner as in a state of nature, and such natural flow or passage of

water cannot be interrupted or prevented by the servient owner to the detriment or injury of the dominant owner. In each case however, where such proposition is laid down, the case itself presents peculiar features easily distinguished from this case. We will notice some of them.

The case of *McDaniels v. Cummings*, 23 Pac. 795, was an action concerning land in the Sacramento River valley. The land next to the river is highest, and when in a rainy season that river overflows, the valley beyond is inundated, to prevent which a land owner proceeded to erect an embankment to prevent such overflow, which caused such overflow water to set back upon the plaintiff's lands, causing it to cover a larger area thereof for a longer period than it otherwise would. The court in determining that case held that the land owner had a right to protect himself against water overflowing from the river, following the English case of *Rex v. Commissioners*, with respect to waters of the sea, viz: That they are a "common enemy" against which every man has a right to defend himself, regardless of the fact that the barriers he erects may cause the flood to rise higher or flow with greater force upon his neighbor.

The court in the course of its opinion says: "If the owner of the land next to the river will not, either by himself or in combination with those behind him erect a levee on the bank, he ought not to be allowed to prevent them from protecting themselves merely because by so doing they prevent his higher land from being drained of the flood water as rapidly as it otherwise would be."

The court in that case distinguish such conditions from inundations by rainfall, which in *Ogden v. Connor*, 46 Cal. 346, was defined as follows:

"When two parcels of land belonging to different own-ers, are adjacent to each other, and one is lower than the other, and the surface water from the higher tract has been accustomed by natural flow to pass off over the lower tract, the owner of the lower tract cannot obstruct this flow. The owner of the upper tract has an easement to have the water flow over the land below and the land below is charged with a corresponding servitude."

And this the court says is intended as a statement of the common law rule, but it is probably a better statement of the civil law.

Neither the cases of *Ogden v. Connor,* or *McDaniels v. Cummings, supra,* relied upon by the plaintiff in error, are authorities in point in this case. In *Ogden v. Connor,* the language of the court in stating the rule bases it upon surface water from the higher tract, which has been accus-tomed by a natural flow to pass off over the lower tract. The words "natural flow" here used clearly distin-guish that case from the one under consideration. And the facts in *McDaniels v. Cummings* are clearly distinguish-able from the case under consideration, because in this we have only to consider surface water descending from the clouds. These questions were again brought before the su-preme court of California in *Gray v. McWilliams,* 32 Pac. 976, in which the rule in each of the cases of *Ogden v. Connor* and *McDaniels v. Cummings* is by that court re-affirmed. In the opinion of the court, however, speaking by Searls, J., they say:

"In the case of surface waters having no defined chan-nel of escape, and the owner of the land upon which they are found being impotent to rid himself of their presence,

the law wisely provides that the laws of nature shall be left untrammeled in their disposition."

The last statement of the California court brings us very close to the case under consideration, for here we have a case in which the accumulating surface water has no defined channel of escape, and if one is made it must be in addition to what nature has provided.

Counsel for plaintiff in error have called this court's special attention to the case of *Shumen v. Flynn*, 61 N. W. 452, as being a case closely in point, and say that the court held in that case that the drainage of surface water to and upon the premises of another does not constitute a tort or an actionable wrong. We are unable to get such meaning from the language used in that case. The facts were that the dominant owner had a depression in his land which filled with surface water, and in 1871, some twenty years before the case was tried, he dug a ditch 96 rods long upon his own land, to the head of a ravine, which conveyed the water across an adjoining 40 acre tract, and thence across the land of defendant into a lake. This ditch was permitted to fill up in the course of four or five years. The overseers of highways caused condemnation proceedings to be instituted in 1893 for the purpose of opening this ditch, which resulted in an order directing the same to be opened, which act was enjoined. A trial followed, in which the court found that the opening of the ditch would raise the waters of the lake in the spring of the year higher than it otherwise would be to the extent of submerging one and a half or two acres of land, to his damage in the sum of about fifty dollars. Judgment was entered for this sum,

which judgment was reversed upon appeal. The court in its opinion modified and criticised several prior decisions of that court, and finally concluded:

"We hold that one has a right to drain his land for any legitimate use, whether for a railroad track, a wheat field or a pasture, and whether the improvement is directly or wholly for the purpose of drainage, or whether it is for some other purpose, and such drainage is a mere incidental result. But, if he collect or convey the surface water off his own land, he shall do what is reasonable under all the circumstances, to turn it into some natural drain, or into some course in which it will do the least injury to his neighbor, and if he would prevent it from coming upon his land, he must not do so by obstructing some natural drain, and thereby hold back the water and flood the land of his neighbor, at least if such natural drain is an important one. Applying these principles to the present case, we are of the opinion that these limitations on the common law right of the owner to improve his land·so as to rid it of surface water do not prohibit this defendant from draining this depression in the manner proposed. As before stated, it fairly appears that this is the only natural drain reasonably accessible; and the consequent injury to others is not so great, as compared to the benefit to be derived from the improvement, as to make it unreasonable on that account. The judgment appealed from is reversed, and judgment ordered for defendant."

This is the strongest case presented by the plaintiff in error in support of his contention, and is distinguishable from the case under consideration in this: that there the water was discharged through a ravine into the lake below, while here the water by means of the ditch was discharged upon and permitted to spread out over the land of defendant in error.

In Amer. & Eng. Enc. of Law, vol. 10, page 236, the author says.

"The upper proprietor cannot collect the waters from his estate and discharge them by artificial channels in a new direction or in increased volume upon the lands of the lower proprietor to his injury."

In the case of *Butler v. Peck,* 16 Ohio 336, 88 Amer. Dec. 452, we have a case closely analogous to the one under consideration. In that case the defendant Peck is shown to have been the owner of a tract of land having thereon a low, wet and swampy marsh or basin covering some 5 or 6 acres of land, upon which at certain seasons water stood to a great depth, and at other times to a depth of from 1 to 6 inches, until it passed off through a natural outlet, or by evaporation, or passed off by percolation through the soil. The natural outlet would not take all the water off. From 1 to 6 inches would remain and pass off by evaporation and percolation. The defendant dug a ditch within twenty-five rods of defendant's north line, where it terminated, where the water was discharged upon the surface of defendant's land, and from thence on to the land of an adjoining owner, and thence to the land of the plaintiff, In the trial of the case the court instructed the jury as follows:

"If you find that after the natural outlet had ceased to carry off the water, there still remained a basin covering several acres, on which water stood to the depth of one, two, or three inches or more, which would not have passed upon the land of plaintiff but for this improved channel, the plaintiff is entitled to recover."

This charge of the trial court was excepted to, and the

question brought to the supreme court of that state; and in passing upon the question thus presented the court said:

"The sole question made by that part of the charge to the jury which is complained of, is this: Whether an owner of land having upon it a marshy sink or basin of water, which basin, as to a considerable portion of the water which collects within it, has no natural outlet, may lawfully throw such water by artificial drains upon the land of an adjacent proprietor. We are clear that no such right exists. It would sanction the creation by artificial means of a servitude which nature has denied. The natural easement arises out of the relative altitude of adjacent surfaces as nature made them, and these altitudes may not be artificially changed to the damage of an adjacent proprietor. And it makes no difference that in the hypothetical case on which the charge of the court below complained of is based, in times of high water, a portion of the waters of the basin would overflow along a natural swale to and upon the lands of the plaintiffs below; for as to those waters which naturally could not surmount nor penetrate the rim of the basin, but were compelled to pass off by evaporation or remain where they were, the case is the same as if the basin had no outlet."

In *Livingston v. McDonald,* 21 Iowa 160, 89 Amer. St. Rep. 564, second syllabus, the court says:

"Where the owner of higher lands constructed a ditch to drain the surface water therefrom, which increased the flow of water upon a lower proprietor, or which threw the water upon his land in a manner different from that in which it would have naturally flowed, to the latter's injury, the former is liable for the injury thus occasioned, even though the ditch was constructed by him in the course of the ordinary use and improvement of his farm."

And again:

"Injuries by flowing surface water, done to a neighbor as the result of ordinary farming operations, such as plow furrow, are not actionable; but where ditches which caused an increased flow of water on the lands of an adjoining owner were dug to reclaim or improve the land, the higher owner is liable."

In the course of the opinion in this case the court cites approvingly the language of Lewis, C. J., in *Wheatly v. Baugh,* 25 Penn. 528, 64 Amer. Dec. 721:

"Accordingly the law has never gone so far as to recognize in one man a right to convert another's farm to his own use for the purposes of a filter."

In the course of his opinion in *Livingston v. McDonald,* Mr. Justice Dillon in commenting upon the trial in the court below said:

"The court, in substance, laid down the law to the jury to be that if the ditch in question increased the quantity of water upon the plaintiff's land to his injury, or without increasing the quantity, threw it upon the plaintiff's land in a different manner from what the same would naturally have flowed upon it, to his injury, the defendant was liable for the damage thus occasioned, even though the ditch was constructed by the defendant in the course of the ordinary use and improvement of his farm.

"We recognize the fact (to use Lord Tenterden's expression) that surface water or slough water is a common enemy which each land owner may reasonably get rid of in the best manner possible, but in relieving himself he must respect the rights of his neighbor, and cannot be justified by an act having the direct tendency and effect to make that enemy less dangerous to himself and more dangerous to his neighbor."

This language of the court in that case is directly

applicable to the case under consideration, and would seem to lay down a reasonable and correct rule governing causes arising under circumstances of like import.

In this case it is shown that the surface water collecting in large quantities in the depression or basin upon plaintiff in error's land, had no natural outlet, and seldom if ever overflowed the banks or rim of the depression, and disappeared only by evaporation and percolation. If its presence there was a detriment to that tract of land, such detriment could not by the act of the plaintiff in error be inflicted upon the servient tenement. The land of plaintiff in error might rightfully be cultivated to the very brink of the depression, in fact to the water's edge, and whatever of drainage was incident to a proper cultivation of the land, the servient tenement was bound to receive, but a matter of drainage of the depression in question, constructed for the purpose of drainage and consequent increased valuation, followed by a corresponding detriment to an adjoining owner, is in violation of the general rule as now established by American authorities; and we hold that where surface waters reach and become a settled body of water, retained in a natural body or receptacle, forming a lake or pond which is emptied only by evaporation or percolation, they lose their character as surface waters, and may not be drained by artificial means to the damage of a lower or servient tenement, without the person so artificially draining becoming liable for damages thus inflicted.

It follows that the judgment of the district court must be affirmed with costs.

Beauchamp, J., who presided in the court below, not sitting; all the other Justices concurring.