No. 25,992.

JOHN J. SCHRAG, *Appellee*, v. THE BLAZE FORK DRAINAGE DISTRICT, *Appellant*.

#### SYLLABUS BY THE COURT.

1. DRAINS—*Drainage Districts—Jurisdiction Over Surface Waters.* A drainage district, organized under chapter 168 of the Laws of 1911, through its board of supervisors, has exclusive jurisdiction over surface-water drainage within its boundaries.

2. SAME—*Powers and Authority of Districts.* The supervisors of such a drainage district are authorized to change the channels of ditches, drains or watercourses and to relocate and establish new ones. The judgment and discretion vested in them may be exercised without interference or control by the courts unless fraud or bad faith enter into their action.

3. SAME—*Construction of Ditch—Bad Faith.* The fact that a drainage ditch constructed by the supervisors of a drainage district did not have sufficient capacity to take care of a flood caused by excessive rainfall did not imply bad faith, where the supervisors, in constructing the ditch in question, acted under the advice of competent engineers.

4. SAME—*Jurisdiction Over Prior Individual Drains.* An individual who by artificial means conveys waters from submerged lands in one drainage area, watershed or district to another has no vested right, by priority, to continue the maintenance of his ditches and outlets within the district to which the water is conveyed against the will and contrary to the judgment of the supervisors thereof, although such drainage district was subsequently organized.

5. SAME—*Use of Joint Drains—Compensation.* An individual or drainage district conveying water from one drainage area or watershed into the natural drainage outlet of another district is bound to pay the reasonable compensation incident to the disposition of such water.

Appeal from McPherson district court; WILLIAM G. FAIRCHILD, judge. Opinion filed July 11, 1925. Reversed.

*Frank O. Johnson*, of McPherson, and *Thomas A. Pollock*, of Kansas City, for the appellant.

*Frank L. Martin* and *James N. Farley*, both of Hutchinson, for appellee.

1. Drains, 19 C. J. § 194.   2. Id., 19 C. J. § 189.   3. Id., 19 C. J. § 153.   4. Id., 19 C. J. § 194; 21 L. R. A. 605; 19 L. R. A. (N. S.) 169; L. R. A. 1916E 429; 27 R. C. L. p. 1159.   5. Id., 19 C. J. § 194.

The opinion of the court was delivered by

HOPKINS, J.: The action was one for mandatory injunction to require the removal of a dam placed in plaintiff's drainage ditch, and to enjoin the collection of special assessments levied on plaintiff's land to maintain the defendant's drainage system. The plaintiff prevailed, and defendant appeals.

About two and one-half miles west of McPherson is located a fresh-water marsh or swamp designated on the United States geological maps as a sink or depression without natural drainage outlet. It covers about 2,000 acres and has been generally known as "The Basin." In its natural condition, before the occurrences narrated herein, it received and held, until lost by evaporation or percolation, the surface waters from the surrounding drainage area of approximately 20,000 acres. The plaintiff owns nine quarter sections of land situated in this basin.

The defendant, the Blaze Fork drainage district, is south of and adjacent to the basin. It comprises the headwaters of the Blaze Fork creek. The Blaze Fork creek has a natural drainage area of about 7,000 acres. The basin is no part of the natural watershed of the Blaze Fork creek.

Plaintiff, about 1911, commenced the construction of a dike around his nine quarter sections of land. On the outside of the dike he constructed a ditch. In this manner he excludes from the basin the water from the 20,000 acres of its drainage area. This water from the 20,000 acres he collects in his ditches and conveys to a point near the southwest corner of his nine diked quarter sections, thence through an outlet ditch south and into the defendant drainage district at the north line of the northwest quarter of section 34-19-4 west of the sixth principal meridian; thence southeasterly across the northwest quarter of section 34; thence easterly and southeasterly to the east line of the southeast quarter of section 34 into the Blaze Fork creek. The Blaze Fork creek was not of sufficient capacity to carry off the additional waters from the basin, with the result that farmers living along the Blaze Fork creek had their hay and mow lands and some alfalfa lands permanently injured.

The defendant drainage district was organized December 7, 1916, under chapter 168 of the Laws of 1911. One of the reasons for its organization was to protect the lands in the district from overflow by water from the basin cast upon them by means of plaintiff's

ditches. Eighteen months after its organization, by decree of the district court, it brought into the district the northwest quarter of section 34-19-4 west of the sixth principal meridian, belonging to plaintiff, which extends to the southern margin or rim of the basin. The plaintiff's outlet ditch, leading in a southeasterly direction through this quarter section and then east, had two mouths: one at its intersection with a road ditch on the east line of section 34, which empties into Blaze Fork creek; the other in a depression or shallow draw on the southeast quarter of section 34. The drainage district constructed a ditch directly south along the center line of section 34 and placed a dam in the plaintiff's ditch, which runs east from that point.

The court found, among other things:

"That on June 10, 1918, the northwest quarter of section 34, township 19, range 4 west of the sixth principal meridian, then and ever since owned by the plaintiff along with other lands, were included in the defendant district by a decree of the district court of McPherson county.

"Third. . . . That in 1918 the defendant district employed H. A. Rowland and V. R. Parkhurst, competent drainage engineers, to make a topographical survey of the district and submit the same to the board of supervisors, with reports and profiles of said survey and a full and complete plan of drainage, reclaiming and protecting the lands in said district from the overflow of or damage by water or floods. Said engineers and the board of supervisors of the defendant also consulted with H. B. Walker, then state drainage engineer of the state of Kansas, with reference to the drainage problems and plans for a drainage system for the defendant district. The said Rowland and Parkhurst made a topographical survey, maps, plans, estimates of cost, and reports for said improvements, and submitted the same to the defendant's board of supervisors for their consideration. Said engineers inspected all the lands and property in the defendant district, classified the same, estimated, apportioned and assessed against the various tracts of land and property in said district the benefits and cost of its system of drainage ditches, and reported as to all of said matters to the board of supervisors of the defendant district.

"Fourth. . . . That the defendant's board of supervisors, upon the filing of the reports of its said engineers, together with their estimates, maps, plans, profiles and proceedings, gave due and proper notice, as required by chapter 168 of the Session Laws of 1911, of the said plans and assessments and benefits for a hearing of the same to be held on July 16, 1918. At said date the said board of supervisors met with the said engineers, and said board heard objections to said plans and assessments and benefits, and after having heard all the objections made, the said board approved the report of the said engineers of the said plans and specifications and the assessments and benefits, with slight modifications of assessments of benefits, and duly adopted the said plans and specifications and assessments and benefits, as so modified by them. The

ditches and drains were duly constructed according to the said plans and specifications and were completed in the year 1919.

"Fifth. . . . That the drainage area of the defendant's district comprises the headwaters of the Blaze Fork creek, and consists of some 7,000 or 8,000 acres.

"Sixth. . . . That the drainage area of the basin consists of an area of about 20,000 or 22,000 acres.

"Fifteenth. . . . That in June, 1923, there was an excessive rainfall, a rain of four or five inches falling from eleven in the evening by daylight the following morning. This rainfall caused a flood in the drainage area of about ten miles west of the point where the defendant's drain was constructed to take the water from the said stream. At that point the fall is very heavy and the area drained consists of about 8,000 acres.

"Twentieth. . . . That the plaintiff constructed his ditch pursuant to chapter 175, Session Laws of 1911, . . . and that he continued to increase its capacity. . . . That there is an area of more than 20,000 acres of land that drains from the north, northwest and northeast into the basin. That the plaintiff's dikes around the land which he owns has a tendency to increase the head of water in time of flood and to cause a heavier flow of water in his ditch.

"Twenty-fifth. . . . That the basin belongs to and is a part of the natural watershed of the Blaze Fork and that the plaintiff, in constructing his ditch, followed the general course of natural drainage, and that during excessive rains the water in the basin overflowed the rim and ran in the general course followed by plaintiff's ditch and emptied into the Blaze Fork on the east side of section 34.

"Twenty-sixth. . . . That only that part of plaintiff's land in section 34 is within the defendant's drainage ditch district and subject to taxation for its construction and maintenance; and that the balance of plaintiff's land is outside of defendant's drainage ditch district and not subject to taxation."

The court concluded that the plaintiff's drainage system was authorized by chapter 175 of the Laws of 1911, and that in the construction of his ditches plaintiff acted fully within the law; that priority in time is priority in right, and where an individual organizes and constructs a drainage system, the rights of the individual and his system of ditches cannot be interfered with by a subsequently organized drainage district; that plaintiff is entitled to the full benefit and unobstructed use of his ditches as originally constructed so long as he maintains them in good shape and that the dam placed across his ditch at the center of section 34 is an unlawful obstruction and should be removed. The court ordered the removal of the dam and enjoined the defendant district from rebuilding or reconstructing the dam or in any manner interfering with the plaintiff's ditch, also enjoined the collection of assessments on plaintiff's property outside of the drainage district, but held that

the connection of the two drainage systems should be allowed to remain and operate as now conducted.

The defendant contends that the court's decision was based on finding No. 25, and that finding No. 25 is contrary to the evidence and is an erroneous conclusion of law and of fact. On this point we find no evidence tending to support the court's finding that the basin is a part of the natural watershed of the Blaze Fork. There was testimony to the effect that on one occasion only, in 1880, was there sufficient water in the basin to overflow its rim. The only witness (A. Bass) who testified to this fact stated that whether or not the water was running he could not say; that the wind drove the water, but how much he did not know, and that that was the only time in forty years that this had occurred; that the basin had no natural outlet.

"Q. At that time in 1880 was there a depression cut at the sides so that the water would run through from the basin down to the Blaze Fork? A. No, sir.

"Q. Since you have been here (forty-five years) what have you observed about the basin having water in it—what portion of the time? A. I think two-thirds of the time it has had water in it.

"Q. The different maps you have made don't show that the basin has any outlet anywhere? A. There is none. It has a rim around it, the same as any lakes or ponds or basins."

A United States geological survey topographic map of McPherson county designates the basin as a depression or sink without an outlet. Another map, a part of an atlas published in 1884, and for many years in general use, shows the boundaries of the basin, that it has no outlet, that streams flow into it, and that Blaze Fork does not connect with it. It is designated on this map as "The Big Basin." Another map and atlas of McPherson county published in 1903 shows the basin; shows the streams flowing into it; that there is no drainage outlet from it and that Blaze Fork creek is several miles south of it. Another map from a state atlas published in 1887, certified to as correct by A. Bass, then county surveyor of McPherson county, shows the basin to be a sink or basin without an outlet. Other topographic maps made from surveys by A. H. Rowland and B. R. Parkhurst, engineers, and made a part of the court's findings, show the basin had no natural drainage outlet; that it is a sink or depression; that the drainage of the land about the rim of the basin is toward the basin at every place.

Engineer Walker, among other things, testified:

"Q. Is there any natural drainage out of the basin towards the Blaze Fork drainage district? No, sir; there is none.

"Q. Is there a natural rim or formation around, between the Blaze Fork drainage district and what you call the basin north of it? A. Yes, sir."

The conditions confronting the parties at the beginning of this litigation, however, appear to eliminate the controversy over this particular point. On the one hand it appears that the drainage district, upon its organization or shortly thereafter, acquiesced, in part at least, in what had theretofore been done by the plaintiff. It took unto itself the northwest of section 34, owned by the plaintiff, which was traversed by his ditch. It acquiesced by assuming to take and dispose of the water which the plaintiff turned into the Blaze Fork area from the basin through his ditch. On the plaintiff's part, he appears to have acquiesced in the organization of the defendant drainage district, paid special assessments levied on his land, both in and out of the district, and otherwise acquiesced until the flood of 1923. When the flood came and plaintiff's land was submerged like other lands in the vicinity, he began this action to enjoin the defendant district from in any manner interfering with his private drainage system.

The chief question on which the controversy turns is whether an individual may maintain a private drainage system within the borders of a public drainage district without the consent and against the will and judgment of the authorities of the district, and especially may the individual maintain such a private system without the consent of the district when he conveys through his system waters from another drainage area or watershed by artificial means rather than natural drainage—may he do so for the purpose of reclaiming submerged lands by collecting the water that would otherwise flow thereon and cast it upon a lower owner to the lower owner's injury?

It appears that the Blaze Fork creek during a period of upwards of fifty years was so narrow at places that one could step from bank to bank. It drained an area of approximately 7,000 acres. These conditions existed at the time the plaintiff opened his ditch in 1912 and flooded the farms along the Blaze Fork with the waters from the basin. As has been said, this was one of the chief reasons for the organization of the Blaze Fork drainage district. It employed competent engineers, followed their plans and specifications, and constructed its drainage ditches. It constructed a ditch through the center line of section 34 larger than the plaintiff's ditch in order

to carry his water in that direction and prevent injury to the lands along the original outlets of plaintiff's ditches. For instance, the plaintiff's ditch at the center of section 34 was 40 feet wide at the top, 12 feet at the bottom and 5 feet deep. The defendant's ditch at the north end was 43 feet wide at the top, 12 feet at the bottom and 5 feet deep. At the south end on the southeast quarter of 34 it was 50 feet wide at the top, 14 feet at the bottom and 7 feet deep, having a fall of 1.3 feet in half a mile—a straight ditch, capable of carrying a good stream of water. The defendant's ditch, being larger in size and with a better fall, took care of more water than both the Schrag outlet ditches were able to carry.

Engineer Walker testified:

"Q. Have you calculated the comparative capacity of the Schrag and the Blaze Fork at their place of intersection? A. Yes, sir.

"Q. Tell us what the relative capacity of the two ditches are at that place? A. When flowing at a depth of 3 feet, the capacity of the Schrag ditch at the lower end is aproximately 75 cubic feet per second. The ditch along the north and south center line of section 34, and receiving the discharge from the Schrag ditch, when carrying the same depth water has a capacity of 91 cubic feet per second.

"Q. What, as near as you can ascertain, was the cause of the overflow of the Blaze Fork drainage district in 1923? A. The runoff from the drainage area of about 7,000 acres above the point where the ditch starts exceeded the capacity of the ditch, and this was brought about from excessive rainfall in the drainage area following a period of rather unusual precipitation.

"Q. What effect did the construction of the Blaze Fork drainage district system of ditches have on the lands of the plaintiff, Mr. Schrag, outside of the drainage district? A. The effect would be somewhat beneficial, due to the fact that the outlet ditch had more capacity than his ditch from his basin.

"Q. Have you observed the dikes constructed by Mr. Schrag in the district which we call the basin? A. Yes, sir.

"Q. What was the effect of that, of the Schrag system of dikes and ditches? A. He has constructed a dike or levee about nine quarter sections of land, and thus cut out of the basin this amount of storage, and when the water comes from the drainage area of the basin it has less room to spread out, and accordingly it rises higher over the floor of the basin that is without the dikes. This in turn increases the head or height of the water flowing in the Schrag ditch and throws more discharge into the Blaze Fork drainage district.

"Q. Is there a natural rim or formation around, between the Blaze Fork drainage district and what you call the basin north of it? A. Yes, sir.

"Q. Would there any waters in 1923 (have) flowed into what is called the basin, excepting for the cutting through that natural rim or formation? A. None.

"Q. Then whatever water moved from the territory of the Blaze Fork into the basin in 1923 went through this artificial channel or ditch called the Schrag ditch? A. Yes, sir.

"Q. And would not have passed into the basin except for that ditch?    A. Yes, sir; that is right.

"Q. Is that Schrag ditch constructed along or in any natural course of drainage?    A. Not in my judgment.

"Q. Have you examined the plans of the Blaze Fork drainage system of ditches?    A. Yes, sir.

"Q. Are the locations of the ditches, in your judgment as an engineer, reasonably proper and correct?    A. They are reasonably so.

"Q. Are the grades of the ditches and their dimensions reasonably sufficient for ordinary storms and the surface-water drainage in that district and vicinity?    A. Yes, sir.

"Q. What would be the effect of removing the obstruction or the dam across the ditch called the Schrag ditch near the center of section 34?    A. The only effect that would have, it would have no beneficial effect unless the water in the basin was piled up beyond those dikes so high as to increase the head in the Schrag ditch and throw out unusual quantities of water in the Blaze Fork basin. When that condition prevailed, then the discharge from the Schrag basin is great enough to overflow the capacity of the outlet ditch, and then any additional opening at that point would flood the land in the Blaze Fork district and would be beneficial to the Schrag property."

The record abounds with other similar evidence. What has been quoted is sufficient to show that there was no natural drainage from the basin into the Blaze Fork. It further shows that but for Schrag's artificial outlet from the basin to the Blaze Fork, the waters of the 1923 flood could not have run north from the Blaze Fork into plaintiff's basin.

The plaintiff acquired no vested right by priority to maintain his ditches to the injury of lower lands.

The statute under which the defendant was organized gives it, through its board of supervisors, exclusive jurisdiction over surface-water drainage within its boundaries. The purpose and effect of the statute was to take from private individuals the right to lay out or to maintain ditches within a drainage district without the consent of the authorities of the district. The defendant's board of supervisors, following the advice of its engineers, decided that the water collected and brought into the defendant district by the plaintiff through his outlet ditch should be conducted south from the center of section 34 through defendant's ditch, and not east or eastwardly through the ditches of the plaintiff. It was within the jurisdiction of the board of supervisors of the defendant district to consider and determine along what route the waters should be carried. The decision of the board of supervisors in this regard was pursuant to the advice of its engineers. The advice of the engineers is supported by

the testimony of numerous witnesses that the lands along the high-way adjoining the east line of section 34 and along the Blaze Fork were repeatedly overflowed and injured after the construction of the plaintiff's ditches by water flowing therein from the basin. These facts justified the supervisors of the defendant district in making provision to carry the waters from plaintiff's ditch south from the center of section 34.

Section 15 of chapter 168 of the Laws of 1911, among other things, provides:

"After due consideration of all the evidence before them, the said board of supervisors shall have power to adopt, amend, modify or reject the plan for the reclamation and protection of the land and property in said district recommended by the said engineer and to determine the location, character and extent of the work and improvement necessary to be undertaken by said district and estimate the cost thereof. From the decision of the said board on these matters no appeal will lie, but upon a proper showing at any time thereafter the said board may modify their order, should such a modification be necessary to promote the welfare of the drainage district." (R. S. 24-615.)

There is nothing in the evidence tending to show that the welfare of the drainage district would be promoted by the removal of the dam in question. On the other hand, it is clear that removal of the dam would cause the water from the basin to flow east and that such increased flowage would damage the lands adjoining the outlets on both ditches. The capacity of the Blaze Fork would have to be increased to carry the waters of the basin and its watershed.

In some cases it has been held that the officers of a drainage district may not permit the drainage into the district of waters from another watershed.

In *Borah Drainage Dist. v. Ankenbrand*, 260 Ill. 335, it was held that the drainage statute did not authorize the inclusion in one district of lands in different watersheds which could not be drained by one system, and the construction, in addition to the main ditch and its tributary laterals, of independent systems of drainage for lands which could not be drained by the main system.

The question as to where the defendant's ditches should be located, as to what should be done in regard to the plaintiff's outlet ditches, involved matters of fact, questions of engineering, inquiry as to cost, matters of law, ·a consideration of both the private and public interest, all of which appear to have been honestly considered and decided in good faith.

When drainage districts are organized, all questions as to the location and plans of main or outlet ditches are to be determined by the drainage board. Such is the primary purpose of the law, and in the exercise of the power to locate drains and ditches it may abate, by relocation, or by damming up, not only unauthorized artificial drains constructed by private persons, but may alter and relocate natural watercourses. The act of 1911 gives drainage boards express power to construct ditches across lawfully existing ditches (R. S. 24-625). It vests them with discretionary power as to existing private drains. (See, also, *Snyder v. Baker,* 221 Ill. 608.) A drainage board may, by appropriation, acquire an outlet ditch and the land or an easement in the land upon which a private outlet ditch is located.

In *District of Columbia v. Brooke,* 214 U. S. 138, 29 S. C. R. 560, 53 L. Ed. 941, it was said:

"A property owner cannot urge against the drainage system of the district that he had adopted a system of his own and challenge a comparison with that of the district and obey or disobey the law according to the result of the comparison. The contention virtually denies any power in congress to create a system of drainage to which a lot owner must conform." (p. 148.)

In *Meranda v. Spurlin,* 100 Ind. 380, 382, it was said:

"As to whether or not the method of drainage adopted is the cheapest and most practicable, it has been held, are questions for the judgment of the commissioners, and that, in the absence of fraud, their judgment upon these questions cannot be reviewed; that their decision upon these questions need not be embodied in their report; and that, from their location of the drain, it will be presumed that they first determined these questions." (See, also, *Denton v. Thompson,* 136 Ind. 446.)

The plaintiff's right of way or easement for his east-and-west outlet ditch, and whatever right he had to keep it open at the intersection with the defendant's ditch at the center of section 34, was appropriated by the drainage district at the time it approved the plans for its ditch, and in 1919, at the time it constructed the dam. It appears that the plaintiff stood by and permitted the defendant district to construct its ditch and to put it into operation and to maintain it for four years; that the plaintiff has paid for several years special assessments on account of the cost of constructing the ditch of which he now complains. Under such conditions he is in no position to maintain injunction against the defendant.

In *Buckwalter v. Railroad Co.,* 64 Kan. 403, 67 Pac. 831, it was said:

Schrag v. Blaze Fork Drainage District.

"Where a landowner has stood by and permitted a railroad company pos-
sessing the right of eminent domain to build and put in operation a line of
road across his land, and thereby create large interests useful to the company
and the public, without first having obtained the authority so to do by the
exercise of the right of eminent domain or otherwise, he cannot maintain an
action of ejectment against such company to recover the right of way occupied
by it and necessary for the operation of its road." (Syl. See, also, *Railway
Co. v. City of Hiawatha,* 95 Kan. 471, 148 Pac. 744; *Williams v. Railway Co.,*
62 Kan. 412, 63 Pac. 430; *Dotson v. Railway Co.,* 81 Kan. 816, 106 Pac. 1045;
*Harder v. Power Co.,* 95 Kan. 315, 148 Pac. 603; *Sullivan v. City of Goodland,*
110 Kan. 359, 203 Pac. 732.)

In the instant case the plaintiff sues, not to prevent the original
construction of an improvement, but to prevent the maintenance or
repair of an improvement completed in 1919.

Drainage districts are organized and drainage boards selected for
the particular purpose of settling questions as to the location and
size of drainage ditches. The act under which the defendant was
organized provides an elaborate course of procedure for the settling
of such questions by drainage districts through their officers and for
the protection of the taxpayer and the landowner. It provides for
appeals to the district court (R. S. 24-617). It invests drainage
boards with the power and makes their decision as to the location
and size of ditches final as to plans for the reclamation and protec-
tion of lands within the district. It vests in the board of supervisors
of the district jurisdiction to determine the plans, including the lo-
cation, grades and dimensions of drainage ditches.

Drainage boards cannot be controlled by injunction while in good
faith performing their duties. *Drainage District v. Drainage Dis-
trict,* 104 Kan. 233, 118 Pac. 433, was a case where the defendant
district had planned and constructed certain ditches which diverted
water so as to injure the plaintiff district, flooding and injuring lands
and crops, washing out roads and bridges, all without compensation.
The plaintiff district sought, like the plaintiff here, to abate the de-
fendant's ditches as a nuisance. The court said:

"The statute under which the defendant was organized and is operating
specifically authorizes it to alter, change or abandon the channel of any water-
course in its district and to relocate and establish a new one for such water-
course. (Laws 1905, ch. 215, §§ 7-20.) To accomplish the purpose its author-
ity and operations are not confined to the district, as it is authorized to con-
tract with individuals and private corporations owning lands outside of the
district (Id. § 7, subdiv. 14). The defendant, therefore, had a right to relocate
the channel of the creek, to make dikes and ditches, and to drain the land and
dispose of the water in the way which the directors in their judgment might

deem best, and to that end they could make contracts with landowners outside of the boundaries of the district. The directors of the district being invested with the discretion, judgment and authority as to the best means of accomplishing the purpose, may exercise such discretion, judgment and authority without interference or control by the courts, unless bad faith or fraud enters into their action. (*City of Emporia v. Railway Co.*, 88 Kan. 611, 129 Pac. 161; *Marts v. Freeman*, 91 Kan. 106, 136 Pac. 943; *Photo Play Corporation v. Board of Review*, 102 Kan. 356, 169 Pac. 1134.) While plaintiff alleges that defendants have acted unlawfully and wrongfully, there is no charge of fraud or bad faith on the part of the directors. Mere mistakes, if any were made by them, in plan or construction would not justify interference of the court or the substitution of its judgment for that of the directors. The fact that they may have had a wrong conception of their duties or may have taken some illegal steps in their performance does not imply fraud or bad faith nor conduct so arbitrary, capricious and unreasonable as to indicate an abuse of the power conferred upon them. The absence of a charge of bad faith is sufficient ground for holding the petition to be insufficient." (p. 234.)

In the instant case the evidence and findings indicate that the defendant district was proceeding with the utmost good faith. (See, also, *Railway Co. v. Montgomery County*, 93 Kan. 319, 144 Pac. 209.)

The defendant district is within its rights in permitting the plaintiff to drain the waters from the area of the basin into the Blaze Fork district under such reasonable terms and conditions as the board of supervisors may prescribe. He could not have done so except by the acquiescence of the defendant district.

In 27 R. C. L. 1159 the rule applicable to the drainage of ponds or marsh lands is stated:

"It is generally held that when surface waters by natural drainage collect in a natural basin or depression on the premises of a dominant tenement and escape therefrom only by percolation or evaporation, forming thereby a lake, marsh or pond permanent in its character, the waters so collected and coming to rest may not by artificial means, other than that incident to the cultivation of the soil, be drained to the damage of a servient tenement, without liability in damages for such act, even though such drainage be for the purpose of reclaiming the land. According to some of the decisions laying down this rule, it makes no difference that in times of high water a portion of the waters of the basin overflow its rim and find their way through a natural swale to the neighboring lands, and the owner of land on which a marsh is situated cannot widen and deepen a depression in a natural barrier through which the water runs from the marsh into a pond upon his land, from which it runs off onto adjoining land."

In 3 Farnham on Waters and Water Rights, 2623, section 894, it is said:

Schrag v. Blaze Fork Drainage District.

"A landowner is not permitted to use the land of his neighbor to relieve his own land of a burden naturally resting upon it. Therefore he cannot, in case the surface is such as to collect and hold water in ponds and marshes, dispose of it by simply turning it upon the property of his neighbor. As said by the Rhode Island court, the right to fight surface water does not go so far as to justify a man's draining the puddles of his own land into the well and cellar of his neighbor. Therefore, if an artificial pond has been created on the property of one owner, he cannot cast the water onto lower property, nor can he drain natural ponds onto the property of his neighbor if injury will thereby be caused to him, nor can a marsh or swamp be drained under these circumstances. And under no circumstances can the water be removed by draining it in a direction in which it would not naturally run."

In *Davis v. Fry*, 14 Okla. 340, 78 Pac. 180, 69 L. R. A. 460, it was said:

"When surface waters by natural drainage collect in a natural basin or depression upon the premises of a dominant tenement, and escape therefrom only by percolation or evaporation, forming thereby a lake or pond permanent in its character, the waters so collected and coming to rest lose the character of surface water, and may not by artificial means, other than that incident to the cultivation of the soil, be drained to the damage of a servient tenement, without liability in damages for such act." (Syl.)

In the opinion it was said:

"In this case it is shown that the surface water collecting in large quantities in the depression or basin upon plaintiff in error's land had no natural outlet, and seldom if ever overflowed the bank or rim of the depression, and disappeared only by evaporation and percolation. If its presence there was a detriment to that tract of land, such detriment could not, by the act of the plaintiff in error, be inflicted upon the servient tenement. The land of plaintiff in error might rightfully be cultivated to the very brink of the depression—in fact, to the water's edge—and whatever of drainage was incident to the proper cultivation of the land, the servient tenement was bound to receive; but a matter of drainage of the depression in question, constructed for the purpose of drainage and consequent increased valuation, followed by a corresponding detriment to an adjoining owner, is in violation of the general rule as now established by American authorities, and we hold that where surface waters reach and become a settled body of water, retained in a natural body or receptacle, forming a lake or pond which is emptied only by evaporation or percolation, they lose their character as surface waters, and may not be drained by artificial means to the damage of a lower or servient tenement without the person so artificially draining becoming liable for damages thus inflicted."

There are numerous cases supporting the doctrine laid down in these authorities, some of which may be cited. (*Davis v. Com'r of Highways*, 143 Ill. 9; *Dayton v. Drainage Com'rs*, 128 Ill. 271; *Kaufman v. Lenker*, 164 Ia. 689; *Conklin v. City of Des Moines*,

184 Ia. 384; *Thompson v. Andrews,* 39 S. D. 477; *Dorr v. Simmer-son,* 127 Ia. 551; *Yerex v. Eineder,* 86 Mich. 24; *Brandenburg v. Zeigler,* 62 S. C. 18; *Noyes v. Cosselman,* 29 Wash. 635; *North Point C. I. Co. v. Utah & S. L. C. Co.,* 16 Utah, 246; *Wendlant v. Cava-naugh,* 85 Wis. 256; *Pettigrew v. Evansville,* 25 Wis. 223; *Aldritt v. Fleischauer,* 74 Neb. 66; *Cranberry Creek D. Dist. v. Elm Lake C. Co.,* 170 Wis. 362.)

It is perfectly apparent that the parties to this litigation have a serious problem for solution. Before the plaintiff built his dike and ditches the basin took care of a large volume of water—a drainage area of 22,000 acres. The little Blaze Fork creek, according to nature's arrangement, took care of a drainage area of 7,000 or 8,000 acres. It is laudable for one to reclaim submerged lands and make them agriculturally productive, provided always that in so doing he does not injure his neighbor.

The plaintiff succeeded in reclaiming his submerged land, but in so doing injured other agricultural lands on which he cast the water. The defendant district appears to have attempted in good faith to take and dispose of the water from plaintiff's drainage area and at the same time protect the land within the district. The plaintiff should pay the just and reasonable compensation for the convey-ance and disposition of the water from his drainage area into that of the defendant. The legislature may have had such a situation in view when, in enacting the drainage act of 1911, it provided that—

"When two or more districts shall have their outlet or discharge into the same natural watercourse or stream and it shall become necessary to deepen or enlarge said natural watercourse or stream, each district shall be assessed for the cost of such work in the same ratio to such total cost as the discharge of waters of such district bears to the combined discharge of waters of the several districts emptying into said natural watercourse or stream." (R. S. 24-628.)

There should be coöperation between the parties in solving the problem which confronts them. The defendant should take all proper and reasonable means to dispose of the flood waters of the district and the plaintiff should comply with such reasonable terms and conditions as the board of supervisors of the defendant district may prescribe.

The judgment is reversed and the cause remanded with direc-tions to proceed in accordance with the views herein expressed.

HARVEY, J., dissenting.