GULF, C. & S. F. RY. CO. v. RICHARDSON *et al.*

No. 3582.    Opinion Filed July 7, 1914.

(141 Pac. 1107.)

1.  **WATERS AND WATER COURSES**—Diversion of Surface Water
    —**Injunction.**  An injunction should not be issued to restrain
    one proprietor from diverting surface water from his lands
    or passing it on to the next proprietor unless the evidence clearly
    shows that injury will result to the adjoining proprietor.

2.  **SAME—Right to Divert.**  At common law surface water was
    regarded as a common enemy against which each proprietor
    might protect himself.  He might send it back or pass it on
    to the next adjoining proprietor without liability.

3.  **SAME.**  The common law governing the diversion of surface
    water as adopted and applied in this state has been modified
    and restricted to this extent, namely, that each proprietor may
    divert the same, cast it back or pass it along to the next pro-
    prietor, provided he can do so without injury to such adjoin-
    ing proprietor.  Under this rule of law no one is permitted to
    sacrifice his neighbor's property in order to protect his own.

(Syllabus by Galbraith, C.)

*Error from District Court, Garvin County;*
*R. McMillan, Judge.*

Suit by S. O. Richardson and L. C. Richardson against the
Gulf, Colorado & Santa Fe Railway Company.  Judgment for
plaintiffs, and defendant brings error.  Reversed and remanded.

*Cottingham & Bledsoe* and *Geo. M. Green,* for plaintiff in
error.

*J. T. Blanton* and *L. C. Andrews,* for defendants in error.

Opinion by GALBRAITH, C.  The proprietors of land ad-
joining the right of way of the Gulf, Colorado & Santa Fe
Railway Company commenced this suit to restrain that company
from constructing a box culvert or drain under its roadbed and
tracks so as to dispose of surface water accumulating on the east
side of its right of way, by conducting it through or under its
tracks to the other side thereof.  The cause was tried to the court,
who made findings of fact and conclusions of law as follows:

"CONCLUSIONS OF LAW AND FINDINGS OF FACT.

"The court is familiar with the city of Wynnewood and its topography, fairly familiar with the vicinity of the oilmill, depot, railroad, seedhouse, and the south end of the city of Wynnewood. Wynnewood is built along the Santa Fe Railway Company property north and south, street running parallel with the railroad and perpendicular to it. There are some ten or twelve streets that run down the hill from the east right up to the railway dump.

"The proof in this case is that previous to the building of the railway, previous to the building of the town of Wynnewood, it was smooth land there without washes, and that it drained itself, the topography of the town being that it inclines upward toward the east for several hundred yards from the Santa Fe Railway Company's track. It was a smooth inclination and the soil was smooth. The railroad was built. It built its dump solidly and substantially. On top of that it put cross-ties. Between them it put ballast of stone and crowned it with steel. The Santa Fe Railway is a very solid and compact structure, to turn water or anything else. These streets that run down to it running east and west through Wynnewood would have carried the water off, and it would have gone on percolating without making a gully or washout had it been left alone, but the railway put its structure there and obstructed it. I am sure that the people of Wynnewood in building their homes constructed terraces and embankments to throw the water off themselves and from one locality into another, and in making the streets there they have dug ditches to throw the water off the center or the traveled portion of the streets into the ditches on the sides, and this would necessitate two ditches to each street; ten streets would have required twenty ditches to run the water down against the railway property. I think that would have been a sufficient distribution of that water never to have created an unusual amount of it flowing at any one place; hence I do not think the city of Wynnewood should be held responsible in this matter.

"Now, the water of the south part of Wynnewood, three or four blocks south there, would accumulate in these ditches, and the city would throw it back one way and another, and finally it seems that they got it to where it all collected in one place, and it was at this place, as I understand it, that the box was being placed in the opening or conduit which was being made across the railway property to throw this accumulation of water all out on the lands of the plaintiffs in this case at one point.

"It is unnecessary for a man who is not a practical civil engineer to make any suggestion about the distribution or what would be a proper distribution or what would be the proper way to scatter this water so as to not make it injurious to the lands on which it was thrown; and there is one thing well settled in our law, and that is you cannot accumulate surface water into a large body and throw it out into one place so as to injure the property of another without the injured party having complaint in law. We have nothing better settled in the laws of the state of Oklahoma than this one proposition.

"Plaintiffs come into this court and say that the defendant railway company is cutting an opening through its property south of the city of Wynnewood for the purpose of disgorging the large accumulations of water which form on the east side of the railway track of the railway company in a pond, thereby throwing that water upon the lands of these plaintiffs lying on the west side of the railway track, and plaintiffs ask for an injunction enjoining the defendant railway company from making this opening. After hearing this testimony the court doth allow plaintiffs' injunction."

Upon these findings and conclusions the court rendered judgment as follows:

"It is therefore considered, adjudged and decreed by the court that the defendant the Gulf, Colorado & Santa Fe Railway Company and its servants, agents, and employees be, and they are hereby, enjoined and restrained until the further orders of this court from cutting or attempting to cut a ditch or drain under or across their line of roadbed in section 23, township 2 north, range 1 east, and at a point near the oilmill in the city of Wynnewood, Okla., or at such other point along said road and line of railway, that will let the waters from the said city of Wynnewood into and upon the lands of the plaintiff in this action."

From the order denying a motion for new trial and making said injunction perpetual, the railway company has appealed to this court. Numerous assignments of error are made, but it will be only necessary to consider three of these, namely, the ninth, tenth, and thirteenth assignments, which are as follows:

"That the court erred in its finding of fact and in its conclusions of law and in each and every conclusion of law set out in its finding of fact."

It is admitted that the waters, the disposition of which gave rise to this lawsuit, were surface waters that were accumulated on the east side of the right of way of the railway company, and that the surface from which it was gathered extended over three city blocks in width and four city blocks in length, and that through the joint action of the city of Wynnewood and the oil-mill, an adjoining proprietor to the railway company on the east, these waters were gathered in a ditch and dumped upon the railway company's right of way, at or near the point where it was attempted to construct the drain or culvert, when the order complained of was issued. At common law, surface water was regarded as a common enemy, and each proprietor might protect himself against it without liability. It is said by this court in the case of the *Town of Jefferson et al. v. Hicks,* 23 Okla., at page 688, 102 Pac., at page 80, 24 L. R. A. (N. S.) 214:

"At common law there exists no easement or servitude in the premises of the lower landowner in favor of the owner of the higher land as to surface water which falls or accumulates by rain or the melting of snow. The lower landowner may treat such water as a common enemy and drive it back from his premises by erecting embankments and otherwise preventing its flow thereon, and in preventing its flow onto his premises he may cast it back on the premises whence it came, or upon the premises of others. Such water is subject entirely to his control to the extent that he may receive it or reject it all. *Walker v. New Mex. S. O. Ry. Co.,* 165 U. S. 593, 17 Sup. Ct. 421, 41 L. Ed. 837."

However, the common law governing the disposition of surface water, as adopted and applied in Oklahoma, has been restricted and modified to this extent, namely, that each proprietor has the right to protect himself against surface water, provided he can do so without injury to the adjoining proprietor. In other words, as expressed by one court, "He has no right to sacrifice his neighbor's property in order to protect his own."

It was said by the court in *C., R. I. & P. Ry. Co. v. Johnson,* 25 Okla. 762, 107 Pac. 662, 27 L. R. A. (N. S.) 879:

"The highest courts of the following states, recognizing the rule that the right to divert surface waters under the common law both in England and America had been qualified, hold that a proprietor, without a grant, cannot collect surface water into an arti-

ficial channel or volume and pour it upon the land of another to his injury, or by means of ditches or other artificial means cause the same to flow upon the lands of another where it would not otherwise go, to his injury."

—citing a long list of authorities. The law of this case is admirably stated in the above opinion, 25 Okla., at page 764, 107 Pac. 662, 27 L. R. A. (N. S.) 879, quoting from the decision of the Court of Appeals of the District of Columbia in the case of *Frisbie v. Cowan*, 18 App. D. C. 381, as follows:

"The principle is settled, both by the English and American decisions, that where the higher owner collects the surface water in one body, or sends it down upon the lands of a lower owner in a different manner from that in which it is accustomed to flow, or in a concentrated form, or in unnatural quantities, he is liable for all the damages sustained therefrom by such lower proprietor. The servitude is to have the waters pass over the land in their natural flow, and a discharge of them in any other manner is a violation of the rights of the lower owner. Indeed, it is laid down as text law 'that one has no right, by an artificial structure of any kind upon his own land, to cause the water which collects therein to be discharged upon his neighbor's land. * * *' In a recent case in the Court of Appeals of England, that of *Whalley v. Lancashire & Yorkshire R. Co.*, 13 Q. B. Div. 131, the question has been very fully considered and the principle applied. There, by reason of a very severe rainfall, a quantity of water was accumulated against one of the sides of the defendants' railway embankment to such an extent as to endanger the embankment, and, in order to protect their embankment, the defendants cut trenches in it by which the water flowed through and went ultimately onto the land of the plaintiff, which was on the opposite side of the embankment and at a lower level, and flooded and injured it to a greater extent than it would have done had the trenches not been cut. In an action for damages for such injury, the jury found that the cutting of the trenches was reasonably necessary for the protection of the defendants' property, and that it was not done negligently. But the court was unanimous in holding that, though the defendants had not brought the water on their land, they had no right to protect their property by transferring the mischief from their own land to that of the plaintiff; that they had no right to sacrifice the property of their neighbor in order to protect their own, and, therefore, as said by the court, upon the plainest principle of right and justice, the defendants were liable."

Under the undisputed evidence of this case the surface water that the railway company was seeking to dispose of by the improvements it was attempting to make, and which the court below restrained it from making, was accumulated and gathered on the east side of its right of way by the joint action of the city of Wynnewood and the owner of the oilmill, and the railway company was not responsible for accumulating the water in the ditch that emptied the same onto its right of way. There was evidence to the effect that the emptying of this water upon the right of way was an injury to the railway company's track, and at times of excessive rainfall a menace to the movement of trains thereon. Under the rule announced in the foregoing decisions, and controlling in this state, the company had a right to dispose of this water by passing it under its track to an outlet on the west side of its right of way, provided it could do so without injury to the adjoining proprietors on the west. The court did not find that the completion of the culvert by the railway company and passing the surface water under its roadbed to the west side thereof would injure the plaintiffs, the adjoining proprietors, nor is it clear that the testimony would have supported such a finding. It is true that the trial court doubtless had in mind that the plaintiffs would be injured by the completion of the culvert, but this would not necessarily follow from the findings. The court found that this water was collected in a "large body" on the east side of the right of way, and was intended to be "thrown in one place" on the west side thereof. Frank Merrett, a civil engineer, called in behalf of the railway company, testified on direct examination as follows:

"Q. What is the proposed construction of this box and ditch? A. After the box goes under the main line of the dump on our right of way, it would go south until it emptied into the barrow pit. This would give it an opportunity for the water to spread out uniformly as it did in nature. That is, find its lowest point and spread out as it always did. Q. It wouldn't discharge it all in one body on this land? A. Well, no; it would go down this ditch in connection with this barrow pit. Q. Have you a barrow pit on this side of the track? A. Further down the track we have. We have to do that to get a grade line. Q. Now, it

is the intention to carry the water through here and carry it south on the west side of the track? A. Yes, sir. Q. Until it reaches the barrow pit? A. Until it reaches that low place in the land. That is, find its lowest place and then spread out, and drain off in its natural way."

And on cross-examination he testified in part as follows:

"Q. What is there over there to carry it; the barrow pits? A. We built a ditch to do it on our right of way from the end of the box to that place. Q. There would be no possibility of that ditch overflowing? A. We intend to build it as big as the box anyway. Q. How big is your box? A. Twelve feet. Two six-foot boxes. Q. How close together? A. Right together. Just a partition between them. Q. You are going to undertake to carry that water south? A. South until it strikes the barrow pit. Q. How high is your bank at the lowest place? A. It is a foot and a half or two feet."

In order to justify the court in making the order of injunction, it must have been made clear by the evidence that the plaintiffs would suffer injury by the completion of the culvert and by passing this surface water through the same. This fact is not made to appear, and for that reason the order of injunction is erroneous and should be vacated.

The law makes no distinction in such cases between natural and artificial persons in the duty it imposes. The law holds the proprietor of the estate to the same obligation in the disposition of surface waters, whether he be a farmer, a municipality, or a railway corporation. The trial court overlooked this important fact in discharging the municipality of Wynnewood from liability for accumulating these waters on the railway company's right of way to its injury, and thereby fell into error. The municipality of Wynnewood had no better right to accumulate this surface water in a "large body," and convey it in a ditch and dump it onto the railway company's right of way to its injury, than the company had to pass this water on to the next and lower proprietor to his injury. Such disposition of surface water, if injurious to the adjoining proprietor, is forbidden by the law and the trial court again fell into error in not so declaring the law and in decreeing accordingly.

For these reasons the judgment appealed from should be re-versed and the cause remanded for further proceeding not inconsistent with the law as herein declared.

By the Court:   It is so ordered.