RAINEY et al. v. CLEVELAND.

No. 33667.   May 23, 1950.

Rehearing Denied July 11, 1950.

*220 P. 2d 261.*

Jerome Sullivan, of Duncan, and Rainey, Flynn, Green & Anderson, of Oklahoma City, for plaintiffs in error.

Malcolm E. Rosser, of Muskogee, and Malcolm E. Rosser, Jr., of Duncan, for defendant in error.

O'NEAL, J. This is an appeal from a decree granting a permanent injunction against plaintiffs in error enjoining them from constructing, building,

or rebuilding a levee or levees on the lands of defendant Robert M. Rainey located in sections 12 and 13, township 1S, range 5 W.I.M.

The action was commenced in the district court of Stephens county by defendant in error, hereinafter referred to as plaintiff, against plaintiffs in error, Robert M. Rainey, Robert M. Rainey, Jr., and C. L. Cooksey, seeking a permanent injunction against defendants enjoining them from construcing, maintaining and using certain levees, theretofore constructed on lands belonging to the defendant Robert M. Rainey at or near the east line of plaintiff's land lying in sections 11 and 12, township 1S, range 5 W.I.M.

From the record it appears that plaintiff is the owner of certain land lying in section 11 and the southwest quarter of section 12, township 1S, range 5 W.I.M., and other lands lying north thereof, in all several hundred acres; that defendant Robert M. Rainey is the owner of certain land lying in the southeast quarter of section 12, and the north part of section 13, township 1S, range 5 W.I.M., adjoining plaintiff's land on the east and south; that all, or nearly all, of the lands owned by plaintiff in said sections 11 and 12, and all of the land owned by defendant Robert M. Rainey in said sections 12 and 13 is bottom land in the valley of Wild Horse Creek and is subject to overflow from said stream which flows southernly near or across the west line of plaintiff's land and thence to the southeast across the southwest of defendant Rainey's lands. It is agreed by all the parties that when Wild Horse Creek is at flood stage, all, or nearly all, of the land of both plaintiff and defendant Rainey in said sections 11, 12 and 13 overflow to a depth of from 5 to 10 feet, or more, and that nothing can be done by either party to protect the lands from such overflow. It is not entirely flood water caused by the overflow of Wild Horse Creek which gave rise to this litigation, it is mostly what is called or referred to as surface water which flows from higher land owned by plaintiff and others to the north of plaintiff's land. Plaintiff in his petition alleged:

" . . . that said Wild Horse Creek serves to carry a large amount of water from above, through and over his land and serves to carry a large amount of water from above, through and over defendants' land. He states that the waters so carried by said water course follow the course provided by nature and follow the course which was well defined and in use at the time defendants acquired their land; that from time to time, during periods of abundant or excessive rainfall, the waters concentrating in said water course are in excess of the volume of water the channel of said Wild Horse Creek can carry and that the super-abundant water of said stream during such periods are cast over and upon the premises of both plaintiff and defendants. . . . that some time prior to March of 1947 the defendants and their agents and employees constructed a series of levees along and adjacent to the northerly bank of said Wild Horse Creek a portion of one of said series being located and constructed on the land belonging to plaintiff, and above described, and that said series of levees obstructed and diminished the flow of the excessive water from and across the land owned by plaintiff and caused other waters that, in the absence of said levees, would not have flowed in and over said plaintiff's land to enter thereon and to remain standing thereon for a long period of time. That said levees were so constructed as to keep the water from flowing over and through the natural water course on the northerly side of the channel and discharging the water which otherwise would flow on the northerly side of said channel and water course and instead was discharged upon and held for a long period of time on plaintiff's land.

"He states that after being so constructed and during a period of excessive rainfall immediately thereafter, the levees were demolished and washed out by the force of the super-abundant waters but that defendants have started rebuilding said levees in such a manner as to have the same effect as

above stated, all to the great and irreparable damage to the plaintiff . . . ."

In the absence of the judge of the district court from the county, a temporary restraining order was issued by the county judge of Stephens county and it was continued in force by the district court from time to time until the issues were joined and trial was had.

The answer of defendants admits that defendant Robert M. Rainey owned said land in sections 12 and 13, township 1S, range 5 W.I.M.; that Robert M. Rainey owns other land to the east in sections 17 and 18, township 1S, range 4 W.I.M., and that defendant C. L. Cooksey farms all of said land. The answer further alleges:

". . . that prior to the construction of the levees referred to in plaintiff's petition, the plaintiff constructed, or caused to be constructed, a series of artificial drainage ditches and levees upon his own lands and over and across lands belonging to one L. L. Humphreys without the knowledge, consent or acquiescence of the said L. L. Humphreys for the purpose of collecting and diverting surface waters and flood waters in times of flood from their natural courses and for the purpose of draining said surface and flood waters from the lands of plaintiff which lie north and west of and adjoin the lands of the defendant, Robert M. Rainey, heretofore described as being situate in Township 1 South, Range 5 West; that as the direct and proximate result of the construction of said artificial drainage ditches and levees by the plaintiff, surface waters and flood waters in times of flood were and are diverted from their natural courses and discharged upon the lands of the defendant, Robert M. Rainey, causing large gullies, sloughs and swales to form on said defendant's land, and causing large sand deposits to form thereon, rendering such portions thereof unfit for cultivation; that such gullies, sloughs, swales and sand deposits did not exist upon said land prior to the construction of said artificial ditches and levees by the plaintiff.

"That the defendant, Robert M. Rainey, for the purpose of protecting himself against the violent, excessive and unnatural discharge of said waters upon his land, brought about by the acts of the plaintiff aforesaid, caused to be constructed a ditch and levy (sic) running in an approximate north-easterly-southwesterly direction across his own lands, and in the vicinity of the western line thereof, said ditch and levy (sic) intersecting Wild Horse Creek at their southwestern termini; that by reason of the acts of the plaintiff aforesaid and in being compelled to construct said ditch and levy (sic), it was necessary to construct it in such a place as to cause the defendant, Robert M. Rainey, to lose permanently from cultivation approximately 30 acres of his best bottom land; that said ditch and levy (sic) were caused to be constructed by the defendant, Robert M. Rainey, for the purpose and with the intent to prevent the flow of said excess of surface waters and flood waters collected by the plaintiff by means of the artificial ditches and levees from flowing upon the lands of the defendant, Robert B. Rainey, to its further injury and for the purpose and with the intent of discharging such waters in to Wild Horse Creek at a point on the defendant, Robert M. Rainey's own land.

"Defendants further allege that plaintiff by the use of his bulldozer destroyed a portion of the ditch and levee which had been constructed pursuant to mutual agreement of the parties upon the plaintiff's land a short distance west of the ditch and levee last above referred to as being constructed on the land of the defendant, Robert M. Rainey, and with the result that excessive surface and flood waters collected by plaintiff's artificial ditches were this past spring thrown with such force and violence through the opening made by the plaintiff in the levee which had been constructed by mutual agreement of the parties and against the levee of the defendant, Robert M. Rainey, as to cause the latter to break and wash out, with the result that a strong and swift current of water poured over and across the land of said defendant, Robert M. Rainey, destroying 115 acres of an excellent stand of hybrid corn and

washing large and extensive depressions in the land; that because of said washing away of the levee of the defendant, Robert M. Rainey, it is necessary for the protection of said defendant's land to restore and reconstruct said levee, and especially is this so by reason of the fact that the swift current in the collected waters coming down through plaintiff's artificial ditches and along plaintiff's artificial levees, which pass through the opening made by plaintiff in the levee which had been constructed by mutual agreement and which now pass through the washed out openings made in the levee of the defendant, Robert M. Rainey, are deepening the depressions in said defendant's land and will, unless stopped, destroy a large part of the land of the defendant, Robert M. Rainey, in Sections 12 and 13, Township 1 South, Range 5 West.

"Defendants further allege that the rebuilding of said levee by defendant, Robert M. Rainey, will in no way injure the plaintiff or cause his land to be flooded to any greater extent than it would have been flooded had said levee not been built, and that if defendant's land in Sections 12 and 13 is subjected to greater flooding at this time than it was prior to the building of the ditches and levee on the lands of the plaintiff and on the land of L. L. Humphreys by the plaintiff, said excess flooding is due entirely to the collecting of said waters upon the plaintiff's land and within the drainage area thereof by means of plaintiff's artificial ditches and levees and the discharging of them with great velocity upon the lands of the defendant, Robert M. Rainey."

Reply was by general denial. Trial was to the court resulting in a decree as above stated, and defendants appeal.

There are nine assignments of error presented under one general proposition, which is:

"The evidence is insufficient to support the granting of a permanent injunction and is violative of the principle that equity will not lend its aid to one seeking its active interposition when that person has been guilty of inequitable conduct in the matter with relation to which he seeks relief."

This calls for review of the entire record. It is the contention of defendants that the decree was clearly against the weight of the evidence and violates one of the principles of equity jurisprudence, that is:

"Equity will not lend its aid in any manner to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief." Camp v. Camp, 196 Okla. 199, 163 P. 2d 970.

The evidence shows the ownership of the land as set forth in the pleadings and that, with the exception of about 20 acres owned by defendant Rainey, all the land lies north of Wild Horse Creek; that said creek flows south along the west side of plaintiff's land to a point about 1/16th of a mile south and a short distance east of the center of the northwest quarter of the southeast quarter of section 11. There it turns to a southeasternly direction running to a point about 1/8th of a mile east and a short distance south of the southeast quarter of section 11, which is also the northwest quarter of section 13. There it enters defendant Rainey's land and flows on to the southeast cutting off about 20 acres of defendant Rainey's land on the south side of the stream. For about a mile north of Wild Horse Creek the land of plaintiff and that of defendant Rainey is bottom land. Some is in cultivation and some is pasture. The general slope of this bottom land is to the south and slightly to the east toward Wild Horse Creek so that defendant Rainey's bottom land is for the most part slightly lower than that of plaintiff; the plaintiff, and others, own about 1,000 acres of hill land lying to the north of plaintiff's land, which hill land slopes to the south and naturally drains the surface water falling thereon upon or across plaintiff's bottom land. Plaintiff acquired his land about 1943. Defendant Rainey had owned his land for several years. Many years before plaintiff

bought his land someone had cut what is termed a "diversion ditch" with a small levee on the south side thereof from a point near the northwest of plaintiff's bottom land just at the foot of the hill, running thence a short distance to the northeast, thence turning to the east along the foot of the hill. Just when that diversion ditch and levee were constructed does not appear. The evident purpose thereof was to collect surface water flowing down from the land to the north and prevent it from flowing across plaintiff's bottom land. That ditch was about three feet wide and about three to four feet from the bottom of the ditch to the top of the levee. Just how far east it extended as originally constructed does not appear. In 1943, when plaintiff acquired his land, that ditch had apparently become filled with silt and the levee was so eroded that it no longer caught or drained the surface water off of plaintiff's land. Defendant Rainey had rented his land to his two sons and defendant Cooksey was farming it. Defendant Robert M. Rainey, Jr., went to the Navy during the late war. Some time in the spring of 1946, after his return from the service, he noticed that after local rains and without any overflow from Wild Horse Creek, the water had begun to overflow onto his land from the direction of plaintiff's land in quantities greatly in excess of the flow therefrom in former years. Upon investigation it appeared that plaintiff, about 1944, had reopened and enlarged the diversion ditch above referred to, by the use of a large "bulldozer" so as to make a ditch about eight feet wide and three to four feet deep; that plaintiff had also extended said ditch and levee so enlarged on east across a ten-acre tract owned by L. L. Humphreys and from there on across plaintiff's land to a point about 90 feet from the line between plaintiff's land and that of defendant Robert M. Rainey. From that point after a local rain the water flowing through said ditch was spread out over the surface and flowed across onto defendant's cultivated land and thus rendered it uncultivable. The evidence shows that the water thus drained onto defendant Rainey's land flowed through said diversion ditch constructed by plaintiff eastwardly and southeastwardly between two slight elevations, or knolls, about 75 or 100 yards apart, on plaintiff's land a short distance from the line between the land of plaintiff and the land of defendant Rainey. In addition to the diversion ditch and levee above referred to, plaintiff had constructed a ditch and levee running south and slightly to the east along the west side of his cultivated land to a point southwest of the Humphreys land and the ditch turned to the northeast connecting with the ditch and levee on the Humphrey ten-acre tract which was about one-half mile from Rainey's cultivated land. Defendant Robert M. Rainey, Jr., complained of the situation and, through his tenant Cooksey, had some negotiations with plaintiff looking to the correction of the matter. They had some kind of an agreement concerning which they now disagree. Defendant Rainey apparently understood that the agreement was that Rainey would be permitted to construct a levee and drainage ditch running from the north knoll to the south knoll on plaintiff's land so as to drain the water off on the west side of the south knoll, and that plaintiff would construct a ditch from there along the west side of the knoll on south into the channel of Wild Horse Creek, and that said arrangement would also drain the water from the low area on plaintiff's land and covering several acres lying a short distance north and west of the north knoll. Pursuant to said supposed agreement defendants Rainey and Cooksey proceeded by the use of a bulldozer to construct a levee and ditch running from the north knoll to the south knoll. Plaintiff appears to have been present when this work was commenced and made no objection thereto at the time. But plaintiff did not construct the ditch on south and southeast to the channel of Wild Horse Creek. While the matter stood in that condition there was a hard local rain in the

vicinity. The result was to back water upon plaintiff's land covering a much larger area than that covered by the low place north and west of the north knoll. Plaintiff complained of this and defendants agreed to and did open a space in the levee they had constructed between the two knolls and let the water drain off of plaintiff's land. But defendants told plaintiff that after the water drained off of plaintiff's land, defendant would close the gap in the levee so as to protect their corn crop then growing on defendant's lands. The matter remained in this condition for some time. Defendant Robert M. Rainey, Jr., testified that because plaintiff had not constructed the ditch from the west side of the south knoll to Wild Horse Creek he feared that in case of another heavy local rain, the water would again back up on plaintiff's land and it would be necessary to again open the levee between the two knolls; that thinking it would be agreeable to plaintiff, Robert M. Rainey instructed Cooksey to take defendant's bulldozer and construct the ditch on plaintiff's land from the west side of the south knoll to the channel of Wild Horse Creek; that Cooksey started the work but was immediately stopped by plaintiff's son and ordered off the place; that thereupon further negotiations were had between plaintiff and defendants. Plaintiff denied that he had given defendants permission to construct the levee and ditch between and connecting the two knolls, and denied that he had agreed to construct the ditch from the west side of the south knoll to Wild Horse Creek. Some harsh words were used and plaintiff declared his intention to destroy the levee between the two knolls. Defendant protested and asserted that plaintiff could not do so after having given his consent to the construction thereof and after defendants having expended some $1,200 to $1,400 in constructing the levee and ditch; that thereupon plaintiff informed defendant that "he would show him" and later did show him and destroyed the levee in question.

Thereupon defendants went upon their own land and constructed a ditch and levee extending southwest from the point a short distance east of the southeast corner of the northeast quarter of the southeast quarter of the southwest quarter of section 12 to a point about 500 to 600 feet south and east from the place where the water flowed between the two knolls on plaintiff's land, and constructed a ditch running from that point south and east to the channel of Wild Horse Creek. The object of that levee and ditch was to catch the water flowing from the diversion ditch on plaintiff's land and onto defendant's land before it reached the cultivated portion of defendant's land and to drain the same into the channel of Wild Horse Creek. After the latter levee and ditch had been constructed by defendants entirely upon the land of defendant Robert M. Rainey, a heavy local rain fell in that vicinity and washed out a part of the levee at a point about opposite from where the water from the end of the diversion ditch on plaintiff's land ran between the two knolls. Defendants were about to repair or reconstruct the levee and ditch on their own land when this suit was brought and the restraining order was issued restraining defendants from so doing.

There is some conflict in the evidence as to where the surface water would naturally flow off of plaintiff's land if there were no ditches or levees. Plaintiff's witnesses for the most part testified that the natural drainage would be between the two knolls on plaintiff's lands. Defendant's witnesses testified for the most part that the natural drainage would be to the southeast along the west side of the south knoll on plaintiff's land thence on south and east to Wild Horse Creek. In this connection it may be noted that defendant Robert M. Rainey, Jr., testified that before he constructed the levee between the two knolls, he called upon the S. C. S. (Soil Conservation Service) to advise him and that the S.

C. S. came out and made some surveys, and that the levee and ditch were constructed where the S.C.S. advised. The evidence is that as to flood water coming onto the land from Wild Horse Creek, none of the ditches or levees constructed by either party would have been of any help or protection to either party and would have but little effect in control of such flood water, except perhaps when the flood waters recede from the land. Apparently the trial court was not satisfied with the evidence given by lay witnesses and requested the parties to present some evidence by engineers or experts. Plaintiff employed Mr. Clyde Ferguson of Marlow, Okla., county engineer and surveyor, and defendants employed Mr. Marble J. Carpenter, a registered civil engineer of Lawton, Okla. Ferguson made a survey of plaintiff's land and a portion of defendant's land where the levees were constructed. Therefrom he prepared a plat showing comparative elevations at various places on plaintiff's land and the northwest part of defendant's land. Carpenter made a survey of defendant's land and a small part of plaintiff's land and from that survey he prepared a plat of comparative elevations at various points at and near the places involved. There is little conflict between the two plats as far as comparative elevations are concerned. The figures are a little confusing until we consider an apparent difference of about ten feet in the assumed elevation of the bench mark, or beginning of the surveying. As to the testimony explaining said plats and the markings thereon, and in fact the entire record, it is difficult, indeed, to determine what place or point on the various plats the witnesses were referring to when testifying. The witnesses would, as a rule, for example, say "this ditch commences here and runs to there," with nothing marked or pointed out on the plat from which the record will show what ditch they were testifying about. Considering the testimony of the engineer Ferguson and examination of his plat, it clearly appears therefrom, assuming that all of his contour lines showing comparative elevations are correct, that the natural drainage without any ditches would be at the point testified to by defendant's witnesses, that is, to the southwest of the south knoll on plaintiff's land. The lowest elevation anywhere near the points in controversy is a contour line running south and east along the southwest side of the south knoll, in fact, the contour line running entirely around said knoll. The elevation there shown is 993 feet. The contour lines running east farther to the north and between the two knolls show elevations to be from 994 feet to 996 feet. But be that as it may, the evidence as a whole shows that plaintiff deliberately and intentionally reconstructed and enlarged the old diversion ditch and levee on his land and across the land of Humphreys and constructed other ditches and levees on his own land so as to collect the surface water flowing onto the land from the north, from about 1,000 acres, into the diversion ditch and from there to a particular place at or near the boundary line between lands owned by plaintiff and the lands of defendants where it would flow on down and across the cultivated lands of defendant. Plaintiff did not deny, but admitted, that he reconstructed, or caused the reconstruction and enlargement of, the diversion ditch across the north part of his land and the other ditches. During the trial nature demonstrated the effect thereof to a remarkable degree. While the trial was being held during a night recess a heavy local rain fell in that vicinity. The next morning, before going to the trial, three or four witnesses went to the land and there found a stream of water flowing down the diversion ditch and emerging therefrom about 90 feet from defendant's land. The ditch was full and was about eight feet wide and from a foot to 1 1/2 feet deep.

The surface waters had been collected in the various ditches on plaintiff's land and was being discharged in a large and unusual volume at a point

where it would flow directly upon defendant's land. This was a clear invasion of defendant's rights, and contrary to the law of this state relating to the handling of surface waters. In Chicago, R. I. & P. Ry. Co. v. Davis, 26 Okla. 434, 109 P. 214, it is held:

"Waters and Water Courses—Construction of Roadbed — Overflowing Lands. If a railroad company so constructs its roadbed and ditches as to divert surface water from its usual and ordinary course, and by its ditches or artificial channels causes such water to be conveyed to a particular place and thereby overflows the land of another proprietor, which before the construction of such road, ditches, or channels did not overflow, the company will be liable to such proprietor for the injury."

That is a well considered case and reviews the decisions from a number of jurisdictions. Therein the court quotes with approval from Young v. Tucker, 26 Ontario Appeals, 169, the following:

" 'The right of the defendant to drain his land by ditches is undoubted, but with this right is the correlative obligation to so construct them as to conduct the water which may be carried thereby to a proper and sufficient outlet, so that the water which may be discharged therefrom will do no injury to other proprietors. Anything short of this must, I think, be regarded as negligence for which the defendant would be answerable. The governing principle in cases such as this is that one cannot prevent injury to his own property by transferring that injury to his neighbor's property.' "

In Gulf, C. & S. F. Ry. Co. v. Richardson et al., 42 Okla. 457, 141 P. 1107, it is held:

"The common law governing the diversion of surface water as adopted and applied in this state has been modified and restricted to this extent, namely, that each proprietor may divert the same, cast it back or pass it along to the next proprietor, provided he can do so without injury to such adjoining proprietor. Under this rule

of law no one is permitted to sacrifice his neighbor's property in order to protect his own.

The record in this case clearly shows that before any levees or ditches were constructed by defendants upon their own land, plaintiff had constructed artificial levees and ditches on his land and across the land of another thereby collecting and diverting surface water from plaintiff's land and throwing it in excessive and unusual and unnatural volume onto and over the lands of defendant Robert M. Rainey to his great damage both to his land and his crops. Defendants did no more than try to protect themselves as against the wrongful acts of plaintiff. Plaintiff, in equity and good conscience, is in no position to complain. In Dowlen et al. v. Crowley, 170 Okla. 59, 37 P. 2d 933, it is held:

"A riparian proprietor has no right to construct by dyke, dam, or otherwise, anything which in time of ordinary flood will throw the water in larger volume on the lands of another so as to overflow and injure them, and when flood waters are diverted by one landowner to the land of another, that other has the right to repel it."

and:

"Equity will refuse to lend its aid in any measure to one seeking its active interposition who has been guilty of any unlawful or inequitable conduct in the matter with relation to which he seeks relief."

In International Land Co. v. Marshall, 22 Okla. 693, 98 P. 951, it is held:

"Equity will refuse to lend its aid in any manner to one seeking its active interposition who has been guilty of any unlawful or inequitable conduct in the matter with relation to which he seeks relief."

The instant case clearly comes within the rule there stated. Thereunder the injunction should have been denied. Judgment is reversed, with direction to enter a decree dissolving the temporary restraining order and denying the injunction.