Leon LYNN and Joan Lynn, Plaintiffs
in Error,

v.

Lewis RAINEY and Pearl Rainey,
Defendants in Error.

No. 40429.

Supreme Court of Oklahoma.

Sept. 30, 1964.

As Amended on Denial of Rehearing
Feb. 23, 1965.

Application for Leave to File Second Petition
for Rehearing Denied April 13, 1965.

L. R. Stith, Fairfax, for plaintiffs in error.

Hamilton, Kane & Kane, Pawhuska, for defendants in error.

BERRY, Justice.

This is an appeal from a judgment granting plaintiffs a mandatory injunction based upon written findings of fact and conclusions of law made by the trial court in response to request therefor.

The asserted issues upon which the case was tried eventually were formed by plaintiffs filing their second amended reply to the amended answer and second amended answer to defendants' cross-petition. An important part of the evidence was introduced by means of aerial maps and drawings of the areas involved, all of which appear in the record as black and white photographic exhibits. Unfortunately no legend is furnished, and the testimony elicited from the witnesses fails to identify the different areas depicted by colored lines and symbols, thus reducing the value of this evidence.

In order to provide a comprehensive statement, the following summation is furnished to reflect the factual background which gave rise to the issues dispositive of this cause.

So far as we are here concerned, plaintiffs became joint owners of the NE/4 of Sec. 2, Township 23 North, Range 3 East, in Osage County on July 22, 1950. Plaintiffs have not occupied this land but live a substantial distance away. At such time the adjoining NW/4 was owned by one Morris, father of one of defendants, who became joint tenants of the NW/4 by warranty deed dated September 30, 1954. The plaintiffs are husband and wife as are the defendants, and herein reference, either singular or plural, should be understood to include both spouses.

In 1951 plaintiff cleared and burned the timber and at that time, with assistance of the Soil Conservation Service, had certain work performed which changed the natural surface of his land. A portion of this work consisted of changing the surface contour from the low area on the east in order to drain the land toward the west. This was accomplished by excavation of a ditch west across plaintiffs' land and apparently was done with knowledge of defendants' predecessor in title. Whether this excavation involved clearing and deepening of an existing channel or excavation of a new waterway is a subject of sharply conflicting evidence, to which we shall allude hereafter.

In 1959 both plaintiff and defendant conferred with representatives of the Osage County Soil Conservation District, and eventually it was agreed that a representative would visit the properties and make a study of the water problem. A meeting was held on July 23, 1959, and a survey conducted of the premises in order that recommendations might be made. This representative testified the parties conferred with him on that date and that he outlined plans for handling drainage of the area by advancing three alternatives. These alternatives were: (1) Build a waterway down the drainage channel and across defendants' land. This plan was unacceptable because of defendants' desire to farm the land; (2) Build a diversion terrace running west and north around defendants' property to a bridge at the north side of the farm. This plan was rejected since it was the longest route and required moving the water through the timber; (3) Pick up one of the terraces built years before and route the water generally north from where it came onto defendants' land and then in a westerly direction to the northwest corner of the farm near defendants' house. The witness testified the Soil Conservation Service plan was to concentrate the drainage from other land to be drained across defendants' land.

The representative testified he advised defendants the latter plan was not as feasible as the others. However, he agreed to aid such plan if defendants permitted the water to continue down the waterway and kept it out of the new diversion route until same was covered adequately with Bermuda grass to prevent erosion. This testimony was denied by defendant, who testified he was advised by the Soil Conservation representative to build this waterway in order to divert the water coming from plaintiff's land and flowing around defendants' house. Defendant also denied the representative advised that he would have to plant Bermuda grass. Parenthetically, we note that October ordinarily is not considered the most appropriate time for planting and growing grass in this region.

Plaintiff completed the drainage program upon his own land as outlined by the Soil Conservation representative, part of which entailed building of a dam across the drainage channel near the center of the land. A 36-inch conduit was installed in such dam to retard the accumulated flow of water crossing plaintiffs' farm and onto defendant. On October 2, 1959, a heavy rain fell in the immediate area. The drainage from plaintiffs' land flowed onto and over defendants' farm, seriously eroded and damaged some portions, washed out access roads, including defendants' means of reaching the public highway for approximately six months, and destroyed ingress and egress to defendants' house other than by traveling northwest across a field to the corner of his farm.

Defendant thereafter built a crescent-shaped, earthen dam upon his own land west of the point where water entered, thereby blocking the flow and causing water to back up onto plaintiffs' land. Plaintiffs then filed the present action seeking mandatory injunction directing defendants to remove the dam or to provide a sufficient opening therein to permit water to flow without standing on plaintiffs' land. The trial court viewed the premises and, after extended trial, rendered findings of fact and conclusions of law upon which the judgment appealed from was rendered. The following statement sufficiently reflects matters necessary to consideration of the controlling issues.

The evidence fairly establishes the matters hereinafter related. The general terrain of the area was such that natural drainage from the north, east, and to some extent the south, deposited surface water upon the east 80 acres of plaintiffs' farm. This formed a landlocked lake, or pond, covering a portion of the land at certain times and for varying periods of the year. Size of the lake varied according to the rainfall and general weather conditions, but caused a substantial area of plaintiffs' farm to be unproductive. Other evidence bearing upon the nature and condition of this land prior to plaintiffs' acquisition thereof is noted hereafter.

Prior to 1951 water would stand on the east part of plaintiffs' land a great deal of the time, and during the rainy season the water would back up across the road north. The inundated area was estimated by different witnesses whose estimates varied from 5 to 30 areas. Some witnesses had hunted ducks on the lake in earlier years. One witness who farmed the land in 1949–50 had deepened a pond or "dugout" on the south side in an attempt to concentrate and drain, or "thief", the water by dispersing it into a sand strata. When the 1959 work began there were three ponds or "dugouts" on the land. A number of witnesses, all familiar with the area and plaintiffs' land in particular, and whose knowledge in some instances covered more than three decades, testified concerning the general terrain, the drainage and the long-continued existence of a recognizable lake on plaintiffs' premises. This condition had existed for many years prior to plaintiffs' acquisition of the land.

Another witness, a Conservation Aide for the Bureau of Indian Affairs, had worked on the land prior to 1951. They had constructed a "dugout" near the south side of the lake and had excavated to a depth of over 11 feet seeking a sand which would

draw off some of the water. This work was paid for through a governmental agency. Prior to 1951 there was no natural drainage to the west, and a survey made by this witness showed that a cut of 3½ feet would be necessary to create drainage in that direction. This survey line was run 1,000 feet to the west, having been made at plaintiffs' request, and showed that 500 feet west of the lake the land would provide natural drainage to the west.

Without further narration it is sufficient to observe that the evidence unequivocally established that prior to 1951 a landlocked lake occupied a large part of the east side of the land purchased by plaintiffs; that there was no natural drainage to the west by which such lake could drain; that plaintiffs bought the land charged with notice of the natural burdens attached thereto.

After plaintiffs bought this property they began clearing timber and enlisted aid of the Soil and Moisture Conservation Division of the Bureau of Indian Affairs. The evidence is uncontradicted that pursuant to survey plaintiffs in 1951 contracted for bulldozing of an artificial canal from the approximate center of their east 80 acres and running in a westerly direction. This drainage canal was approximately 3½ feet deep and extended west a sufficient distance to partially drain the lake toward the west.

The trial court's Finding of Fact Nos. 7 and 8 are essentially misleading and erroneous, in that they refer to a draw or ditch leading to the west and northwest onto defendants' land, and that such ditch permitted drainage of some water onto defendants' land. Such conclusion is unwarranted, erroneous and clearly against the weight of the evidence which establishes the entire lack of drainage from the lake prior to 1951. The intended implication from certain evidence was that a natural draw was "cleaned out" in 1951. Evidently such implication reached the mind of the trial court, in view of the erroneous conclusion announced contrary to the positive, uncontroverted evidence. The evidence established that in order to open the canal it was necessary to

cut through a rim or bank which held the water in a basin.

Our statutes, 2 O.S.1961, §§ 801–817, authorize formation of conservation districts as a "public body corporate and politic", in cooperation with the federal government. Both plaintiff and defendant had entered into written agreement with the Osage County Soil Conservation District. The Soil Conservation Service agrees to assist landowners (cooperators) by available means and technical assistance to use and treat their land by applying, developing and maintaining feasible conservation practices. Among other provisions of the written agreement is the following:

"The provisions of this agreement are understood by the cooperator and the District and neither shall be liable for damage to the other's property resulting from carrying out this agreement unless such damage is caused by negligence or misconduct."

In 1959 work was done on plaintiffs' land in conformity with plans proposed by the Work Unit Conservationist (Horn), after he had been over the land and conferred with the parties. This party, as a witness for plaintiffs, admitted that the overall object plan for plaintiffs' land was to slow down and retard the run-off from his land and the surrounding properties, and help slow down the total volume of water reaching defendants' land. The conservation plan was to concentrate the water from an area of 245 acres for drainage across defendants' farm, all of which went to the drainage ditch. The original plan did not call for installation of a metal conduit, but this was done later in the project. Thereafter they blocked part of the conduit in order to further reduce the flow onto plaintiffs' land. The witness stated the alternative selected by defendants was acceptable and the project was approved by the witness, and this was the reason for authorizing payment of government funds. The overall plan allowed water to drain onto defendant; the land was damaged from the drainage, but this resulted from defend-

ants' turning water into the system before it was established; the witness had OK'd the project but not to put water into. The drainage ditch was enlarged in order to drain plaintiffs' land more rapidly and avoid ruining the crops.

Relative to enlarging the 1951 drainage ditch, the evidence showed same was deepened and widened so that the canal was approximately 6 feet deep. The banks, stabilized on ratio of 8 feet to 1 foot, were approximately 12 feet in height and about 100 feet wide at the top. And, in lowering the channel, the ditches were dug from north to south and from south to north to the center of plaintiffs' land and then "clear to the west" for approximately 1,000 feet.

■ The foregoing recitation sufficiently reflects the factual circumstances bearing upon issues determinative of the case. We purposely avoid comment or discussion bearing upon serious questions arising out of the trial court's rulings relative to admission and exclusion of certain testimony. Since this is an equity case, this Court examines the record and weighs the evidence. If the judgment is against the weight of the evidence same will be reversed with directions to render the judgment dictated by the evidence. Abbott v. Woods, Okl., 295 P.2d 793.

The argument urged as grounds for reversal of this judgment are presented by a generalized argument under six propositions, each of which encompasses analysis and interpretation of the evidence supported by citation of text and case authority considered applicable. The brief in support of the trial court's judgment contains three asserted propositions, the first of which contains 14 discussion headings concerned with plaintiffs' interpretation of the evidence and the presumed propriety of the trial court's findings thereunder. The two remaining propositions are combined for presentation under 6 separate topical headings. These range from the claim that defendants had no right of action because they took title to the land in the condition existing at time of purchase, to a heading styled "Ancient History of Water on Land", whereunder is an attempted critique of the evidence as it relates to defendants' position. Limitations of time and space preclude individual discussion of such topics which we do not believe to be required for disposition of the case.

This is not an action based upon the so-called contract with the Soil Conservation Service, or for specific performance thereof. Hence it is unnecessary to make other than incidental reference to such agreement or the argument sought to be based thereon.

■ Plaintiffs' theory of the case, as deduced from the brief in support of the trial court's judgment, may be summarized in the following manner: having signed as a cooperator of the Soil Conservation District, any work thereafter performed was binding upon defendants to the extent that thereafter they could do nothing to prevent carrying out of the overall plan, could not refuse to cooperate, and could do nothing which made the plan unworkable. The fallacious nature of the position assumed by plaintiffs will be discussed more fully hereafter. Equity cannot be called upon to enforce a plan which could result in ultimate destruction of one of the parties to such agreement.

We are concerned with two basic, controlling inquiries: First, did these defendants acquire their property burdened with any right granted plaintiffs to drain accumulated surface water onto such land? Second, within contemplation of the parties, was it understood that cooperation with the conservation program required defendants' land to receive the burden of surface drainage from a project designed specifically to drain plaintiffs' land, and that defendants would be precluded from seeking relief (against surface waters accumulating) to their detriment?

The trial court entered written findings of fact which are not restated, and we note only in regard thereto that in certain respects they clearly are contrary to the weight of the evidence. The court found the following conclusions of law (in sub-

stance), and judgment was rendered in accordance therewith: (1) the defendants purchased their land subject to existing conditions, including any natural or artificial drainage ditches existing; (2) defendants had a legal right to protect themselves against excessive flow of water, but not to plaintiffs' detriment; (3) execution of agreements with the conservation service and with each other bound the parties even though the agreement later proved more beneficial to one of the parties; (4) plaintiffs were entitled to mandatory injunction requiring removal of defendants' dam, or that an outlet be provided therein to permit flow of water from the drainage canal onto and over defendants' land; (5) defendants were entitled to injunction against plaintiffs to prevent further widening or deepening of drainage canal; and plaintiffs to be required to keep the dam on their land in good repair and the conduit in good working order so that it may be partially or completely closed when large amounts of water are moving from plaintiffs' land; that plaintiffs be required to use every reasonable means to slow or retard the flow of water from their premises onto defendants' land at all times.

▆▆▆ It is necessary to measure the correctness of the judgment entered in accordance with the above conclusions under rules of law applicable to the inquiry as to the burdens upon defendants' land at the time acquired. The right to discharge surface water upon the land of another is a valuable property right, constituting an interest in the land. See generally 19 Am. Jur., Estates, Sec. 1 et seq. A necessary incident of property is the right of lawful acquisition, and the law recognizes two means, to-wit: descent and purchase. 42 Am.Jur., Property, Sec. 32. The right of alienation of property is dependent upon the law. A corollary of the doctrine that an owner has a right to dispose of his property is that the owner cannot be deprived of his property except by consent, his own negligence, or some manner provided by law. See 42 Am.Jur., Property, Sec. 52.

Although related to a degree, we are not concerned primarily with questions concerning the right of landowners to accumulate and flow surface waters into a natural water course, or the extent and limitations upon such right.

The essential question involves the issue whether defendants acquired their property burdened with an obligation, theretofore created, to accept accumulated surface water discharged onto their land. The right to create such flow of water would constitute an interest in defendants' property. Ownership of such interest presupposes lawful acquisition which necessarily must be shown by the owner claiming this right, ordinarily denominated the dominant estate.

The argument is made that, in absence of contract, the purchaser of land takes same subject to existing conditions and improvements upon adjacent land, hence defendants have no right of action herein. This argument is without merit, necessarily being based upon the invalid assumption that plaintiffs previously had acquired a lawful right, or interest, to discharge accumulated surface water onto defendants' property.

Any right claimed by plaintiffs herein necessarily was derived by purchase which includes sale, gift, escheat, occupancy, prescription and forfeiture. 42 Am.Jur., Property, Sec. 32. Although no effort is made to assert the nature of the right claimed by plaintiffs, if any existed, it is undeniable same had to come into being either as a license or as an easement. A license is defined as a privilege extended to do some acts on land without possessing an estate therein. In Haas v. Brannon, 99 Okl. 94, 225 P. 931, a license was defined thus:

"License is an authority to do a particular act or series of acts upon another's land without possessing an estate therein. It is distinguished from an easement, which implies an interest in the land to be affected.

"It is an ancient and well-settled doctrine of the common law that a mere li-

cense, whether by deed or parol, is revocable at pleasure, unless coupled with an interest or grant."

Although plaintiffs make no effort to show specific grant of a license, the argument is that defendants' predecessor in title was on the land, had knowledge of the work plaintiff was having done in 1951, and made no objection thereto. We assume this argument intends to imply grant of a license by knowledge of, and acquiescence in, the work. Without considering whether a license possibly could have been created, we are of the opinion plaintiffs cannot rely upon any claim to a license herein. A license is revocable at will except where the same is coupled with an interest. There is neither claim nor showing that plaintiffs had succeeded to any interest in defendants' land. Had plaintiffs acquired a license for flowage of defendants' land same was revoked by conveyance. In 28 C.J.S. Easements § 2, the text states:

"* * * an easement, ordinarily, is a permanent interest in the realty with the right to enter at all times and enjoy it, while a license, at least so long as it is executory, may be revoked at will, and is terminated by a conveyance of the land by the party giving the license."

This principle has been recognized and applied by this Court in McKenna v. Williams, 196 Okl. 603, 167 P.2d 368; Nokes v. Padgett, Okl., 262 P.2d 423. In the latter case it was also stated that mere permissive use of the land of another neither is adverse nor capable of ripening into a prescriptive right. Also see 56 Am.Jur., Waters, Sec. 258.

We are of the opinion that plaintiffs' asserted right to flow surface water onto defendants cannot be upheld upon the basis of a license. Assuming the evidence sufficient to show acquiescence of defendants' grantor to plaintiffs' work in 1951, any license that might have evolved from that transaction was terminated by the conveyance of the land in 1954. Thus, unless defendants vested plaintiffs with some right

subsequent to that date, their rights respecting flowage of accumulated surface waters were the same that existed prior to opening of the drainage ditch in 1951. This simply meant that water which collected upon the east 80 acres of plaintiffs' land could not be drained upon defendants by any artificial means.

The only other basis upon which plaintiffs could assert a right to discharge surface waters onto defendants would be by virtue of an easement acquired for such purpose. In Frater Okla. Realty Corp. v. Allen Laughon Hdw. Co., 206 Okl. 666, 245 P.2d 1144, we quoted with approval the text definition of an easement given in 28 C.J.S. Easements § 1a:

"An easement is a liberty, privilege, or advantage without profit, which the owner of one parcel of land may have in the lands of another; or as conversely stated, it is a service which one estate owes to another, or a right or privilege in one man's estate for the advantage or convenience of the owner of another estate."

This distinction is stated in Tiffany Real Property, Vol. 2 (2nd Ed.) Sec. 1202, in the following manner:

"In so far as an easement involves, as it ordinarily does, the privilege of doing or not doing a certain class of act on or in connection with another's land, there is a superficial resemblance between an easement and the privilege created by a license. The distinction between such an easement and a license privilege lies primarily in the fact that the licensee has a privilege and nothing more, while the holder of an easement has not only a privilege but also rights against the members of the community in general, including the owner of the land, that they refrain from interference with the exercise or enjoyment of the privilege."

Any easement claimed to exist in this case would have to be based upon purchase. If by grant, then the existence of the right

claimed by plaintiffs necessarily would be supported by an instrument of conveyance as required by the Statute of Frauds, 12 O.S.1961 § 136. No such instrument is relied upon by plaintiffs in support of their position.

The remaining means whereby plaintiffs could have obtained this asserted right in defendants' land would have been by prescription. Acquisition of this right by prescription would have required continuous, adverse use of the right (to discharge accumulated waters) for a period of 15 years. 12 O.S.1961 § 93(4); 60 O.S.1961 § 333. And, for plaintiffs to establish an easement by this means would require showing the existence of every legal element required to constitute prescription. Irion v. Nelson, 207 Okl. 243, 249 P.2d 107. The plaintiffs acquired title to their property on July 22, 1950, except for the abandoned school site which was acquired on August 23, 1957. These matters, pleaded in plaintiffs' petition, negative any claim of the accrual of an easement by prescription which would support the right to discharge accumulated surface water onto defendants' property.

■ We are of the opinion, and hold, that the trial court erred as a matter of law in finding that defendants purchased their land subject to existing conditions, including subservience to drainage conditions then existing, and therefore could do nothing to protect themselves which might be detrimental to plaintiffs' property. No legal right existed to discharge accumulated water onto defendants. The judgment rendered upon the basis of such conclusions of law is erroneous and must be reversed.

At this point, and ancillary to the entire problem, we are confronted with the question as to the extent of plaintiffs' rights in regard to discharge of accumulated water prior to execution of the "cooperators'" agreement with the Soil Conservation Service. Between 1951 and 1954, when defendants purchased their farm, the plaintiffs' rights as concerned handling and dis-

posal of surface water at best arose under a bare license. The question then concerns the nature and extent of such right.

■ The long-standing rule in this jurisdiction is stated in Gregory v. Bogdanoff, Okl., 307 P.2d 841, p. 843:

"This court has long given its approval to the 'Common Enemy Doctrine' in a modified and restricted sense. In cases approving same we have said that each proprietor may divert the water, cast it back or pass it along to the next proprietor, provided he can do so without injury to such adjoining proprietor. However, in all such cases we have laid down the rule that no one is permitted to sacrifice his neighbor's property in order to protect his own. See Gulf, C. & S. F. Ry. Co. v. Richardson, 42 Okl. 457, 141 P. 1107."

The quoted rule was referred to in Syllabus 1 of Haskins v. Felder, Okl., 270 P.2d 960, as follows:

"The common law governing the diversion of surface waters as adopted and applied in this state has been modified by the rule of reason."

■ These rules have evolved from the consistent holdings of this Court, in such cases as Davis v. Fry, 14 Okl. 340, 78 P. 180, 69 L.R.A. 460; Chicago R. I. & P. Ry. Co. v. Groves, 20 Okl. 101, 93 P. 755, 22 L.R.A., N.S., 802; Chicago, R. I. & P. Ry. Co. v. Johnson, 25 Okl. 760, 107 P. 662, 27 L.R.A., N.S., 879; Rainey v. Cleveland, 203 Okl. 283, 220 P.2d 261; Cunningham, etc. v. McConnell, Okl., 382 P.2d 429; Roberts v. Sterr, Okl., 312 P.2d 449. In the Davis case, supra, it is declared that a collection of surface water detrimental to the land where standing, cannot be inflicted upon the servient tenement by drainage. Moreover, the opinion succinctly states that any drainage constructed for the purpose of draining collected surface waters and increasing value of the property, and which causes a detriment to an adjoining owner, is in viola-

tion of the settled general rule, which also permits the person constructing artificial drainage to be liable for damages caused the servient owner.

In Chicago R. I. & P. Ry. Co. v. Johnson, supra, the Court said:

"The highest courts of the following states recognizing the rule that the right to divert surface waters under the common law both in England and America had been qualified, hold that a proprietor, without a grant, cannot collect surface water into an artificial channel or volume and pour it upon the land of another to his injury, or by means of ditches or other artificial means cause the same to flow upon the lands of another where it would not otherwise go to his injury: * * *."

Decisions from the courts of eleven states are cited as supporting the quoted rule.

Assuming plaintiffs exercised the right to discharge surface water onto the adjoining land by virtue of a license, this license was revoked by conveyance of the servient estate in 1954. Whatever right plaintiffs relied upon to support their actions subsequent to 1954 likewise had to be by virtue of license, since no grant is, or could be, claimed. And, any license granted by defendants, whether express or implied, was subject to revocation later by defendants. This then brings us to consideration of whether execution of the soil conservation agreement operated to place upon defendants' property the burden of receiving surface drainage from plaintiffs' land to defendants' detriment. This requires some consideration of the agreement in question executed by these parties in the latter part of 1956.

The trial court found the facts to be that both the plaintiff and the defendant had signed written cooperative agreements with the Soil Conservation Service, and that each became bound by such agreements in accordance with the terms and the laws of the State and Federal Governments. Up-

on this basis the trial court concluded as a matter of law:

"That when the plaintiffs and defendants entered into agreements with each other and with the Osage County Soil Conservation District, then they are bound by such agreements, even though it may later prove that such agreements are more beneficial to one of the parties than to the other."

This record discloses execution of separate agreements between the Soil Conservation Service and each landowner. These were executed at different dates and did not purport to define or limit any relationship between individual participating landowners. Neither did any privity exist between the landowners by virtue of the so-called contracts. In no manner can such contracts be construed as agreements between the plaintiffs and the defendants, whereby plaintiffs would be granted the right to flow surface water upon and over the defendants' land. Neither was there evidence from which the trial court could have determined that there was an ancillary, oral agreement which would have supported any such claim.

If, by virtue of the contract between defendants and the District, plaintiffs acquired any standing to assert any rights arising thereunder, this necessarily would have resulted because plaintiffs were third-party, beneficiaries. Nothing contained within the contract purports to extend benefits to third persons, and any benefits accruing to plaintiffs thereby would be purely incidental. Under our statute, 15 O.S.1961, § 29, a third-party contract must be made expressly for benefit of the third party to be enforceable.

The general rule, stated in 17A C.J.S. Contracts § 519(4), points out that a third party who is benefited only incidentally by the performance of such a contract acquires no rights against the promisor or the promisee, and cannot maintain an action thereon. This rule has been ap-

plied by our Court numerous times. In Traders & General Ins. Co. v. Sand Springs Home, 195 Okl. 509, 158 P.2d 1018, Syllabus 1 states:

"In order for a third party to recover upon an agreement between others to which he is not a party, the contract must be made expressly for his benefit. It must be intended to secure some benefit to him and there must be a promise legally enforcible. Electric Supply Co. v. City of Muskogee et al., 171 Okl. 130, 42 P.2d 140."

Being only incidental beneficiaries as respects the contract between defendants and the Conservation District, plaintiffs could not have maintained an action based upon the contract against either of the parties thereto. Thus, having no rights under the contract, plaintiffs cannot claim reliance thereon.

The pertinent parts of the agreement were referred to above. Under the agreement the Conservation District agrees to nothing other than to furnish assistance. The cooperator agrees to apply conservation measures and practices to his land, maintain conservation measures put into effect, and use materials and equipment provided by the District. The District does not guarantee either the competency of those in charge or the quality of the work performed. The agreement provides for termination or modification, and purports to contract against liability for damage to a cooperator's property unless resulting from negligence or misconduct. The nature of this action precludes presentation of any issue relative to negligence of the District or damages accruing therefrom.

However, even if privity of contract be assumed between the landowners the terms of the contract in question fairly can be considered ambiguous. By statute and judicial precedent, a cardinal rule relative to interpretation of contracts is that any contract must be so interpreted as to give effect to the mutual intention of the parties so far as ascertainable and lawful. 15 O.S. 1961 § 152; Cities Service Oil Co. v. Geolo-

graph Co., 208 Okl. 179, 254 P.2d 775. And, in determining what was intended by contract the court should place itself in position of the parties when same was made, so far as possible. Thus, where the parties entering into an agreement fail to use language sufficiently definite to make clear their intent with reasonable certainty the agreement cannot be held to constitute a contract. Colbourn v. Bell, Okl., 294 P.2d 289.

The evidence relating to the problem which defendants had with surface water immediately after they purchased their farm largely was excluded by the trial court for some reason not made clear. The evidence does show, however, that the drainage plan was conceived and put into operation primarily for benefit of, and in order to drain, plaintiffs' land before it drowned the crops. The evidence bearing upon the understanding and agreement of the parties relative to approval of the conservation plan used for defendants is in sharp conflict, as is the question whether there was any agreement that it should not be used until "established".

Under these circumstances the controlling inquiry is whether the defendants were advised, and therefore understood and agreed, that plaintiffs were being extended a right or license to discharge accumulated surface waters onto defendants' land uninterruptedly and without regard to any detriment that might result. And, also, whether defendants further understood and agreed that execution of the contract obligated them to refrain from placing into operation that portion of the conservation plan constructed upon their land until same was "established" or ready for use at an unspecified future date.

Defendants' testimony was that no drainage occurred onto his land until 1955, following purchase in September, 1954. The trial court found the facts to be that defendants agreed in July, 1959, to accept the conservation plan for control of the flowage of surface water from plaintiffs' land. However, for reasons not made clear the

816

trial court sustained objections to testimony by which defendants sought to show that they had no water problem except for plaintiffs' flowage and, therefore, needed nothing done to their land. Defendants' evidence also was that no authority was given plaintiffs to construct a ditch in 1959. This is supported by plaintiffs' testimony concerning the three suggested conservation methods, wherein it is admitted that no discussion was had concerning any work which might be inaugurated upon plaintiffs' property by reason of such agreement.

■ We are of the opinion the conservation agreement was ambiguous and failed to define any purported agreement relative to the actual work to be accomplished and the mutual obligations of the parties thereunder. The resulting ambiguity requires the court to place itself in the place of the parties in an effort to ascertain their intent. In so doing we conclude that when defendants agreed to engage in conservation practices they did not intend to accept a plan by which their land would be required to handle the accumulated surface waters from (245 acres) the area; to extend a right or license to plaintiffs to drain such water onto defendants' land or to construct a ditch for this purpose; to be required to accept the accumulated flow to their detriment; or to engage in a conservation plan which, within common knowledge, would not afford aid or protection until passage of an undetermined and unspecified period of time.

■ For the reasons stated, we hold that the findings of fact were against the clear weight of the evidence. The trial court committed fundamental error by entering the conclusions of law upon which the judgment appealed from was based.

The judgment is reversed with directions to dissolve the mandatory injunction rendered in plaintiffs' favor.

HALLEY, V. C. J., and DAVISON, WILLIAMS and IRWIN, JJ., concur.

BLACKBIRD, C. J., and JACKSON, J., dissent.